## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AFSANEH AZADEH<br>c/o 8080 Ward Parkway, Suite 210<br>Kansas City, MO 64114 | ) ) ) ) | |
| Plaintiff | ) ) | Civil Action No.: 16-CV-1467 |
| v. | ) ) | |
| THE GOVERNMENT OF THE<br>ISLAMIC REPUBLIC OF IRAN,<br>c/o Ministry of Foreign Affairs<br>Khomeini Ave<br>United Nations Street<br>Tehran, Iran | ) ) ) ) ) ) ) | |
| and | ) ) | |
| THE ARMY OF THE GUARDIANS<br>OF THE ISLAMIC REVOLUTION<br>(AKA the Islamic<br>Revolutionary Guards Corps)<br>c/o Ministry of Foreign Affairs<br>Khomeini Ave<br>United Nations Street<br>Tehran, Iran | ) ) ) ) ) ) ) ) | |
| Defendants | ) ) ) | |

## COMPLAINT

Plaintiff, Afsaneh Azadeh ("Ms. Azadeh") complains of the actions of the Defendants,

the Government of the Islamic Republic of Iran and the Army of the Guardians of the Islamic

Revolution ("Defendants"), as follows:

## INTRODUCTION

1.      For four months, beginning on May 13, 2012, Plaintiff Afsaneh Azadeh was jailed and tortured by officials, employees or agents of the Government of the Islamic Republic of Iran and the Army of the Guardians of the Islamic Revolution (aka the Islamic Revolutionary Guard Corp) who were acting within the scope of their office, employment, or agency.  On two occasions, Ms. Azadeh was blindfolded, forced to stand in front of a firing squad, and subjected to mock executions during which firearms were discharged.  She was subject to daily, hours-long interrogations during which she was beaten, whipped, threatened, and intimidated.  She was poisoned and forced to take "truth pills" on a daily basis for the entirety of her detention.  She lived in a cell that was a mere six feet wide and that had no light, no window, no bed, and no adequate access to sanitary facilities.  The cell stank of sweat and rot and the dirty rug on which she slept was infested with insects.  Ms. Azadeh sought to end her life two times, once by overdosing on medication and another by starving herself.  Ms. Azadeh suffered extreme emotional and psychological damage in addition to her physical injuries.  She brings this civil action for compensatory and punitive damages against the Government of the Islamic Republic of Iran and the Army of the Guardians of the Islamic Revolution (aka the Islamic Revolutionary Guard Corp) and their officers, agents, employees, and officials pursuant to the terrorism exception to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605A and supplemental common law causes of action.

## PARTIES

2.      Plaintiff Afsaneh Azadeh is a dual U.S. and Iranian citizen.  Ms. Azadeh became a naturalized United States citizen in 2004, prior to the events alleged herein.  She resides in

Kansas City, Kansas.  At the time of the events that gave rise to this lawsuit, Ms. Azadeh was residing in the United Arab Emirates.

3.     Defendant, the Government of the Islamic Republic of Iran ("Iran"), is a foreign sovereign designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App §2405(j)), Section 40 of the Arms Export Control Act (22 U.S.C. §2780), and Section 620A of the Foreign Assistance Act (22 U.S.C. § 2371). The Government of the Islamic Republic of Iran was designated a state sponsor of terrorism by the U.S. Secretary of State on January 19, 1984.  *See* 49 Fed. Reg. 2836 (Jan. 23, 1984).  The designation was in place both at the time of the events that gave rise to the issues in this Complaint and at the time this Complaint was filed.  Iran, by and through its agents, officers, and employees, caused Plaintiff Afsaneh Azadeh to be arbitrarily detained and tortured.

4.     Defendant the Army of the Guardians of the Islamic Revolution (aka the Islamic Revolutionary Guard Corp) ("the Revolutionary Guard") is a branch of Iran's Armed Forces. The Revolutionary Guard is responsible for internal and border security and controls several wards of Evin Prison, including the ward in which Ms. Azadeh was detained.  The Revolutionary Guard, by and through its agents, officers, and employees, caused Plaintiff Afsaneh Azadeh to be arbitrarily detained and tortured.  Pursuant to the test established by the United States Court of Appeals for the D.C. Circuit, the Revolutionary Guard must be treated as the State of Iran itself as that term is used in 28 U.S.C. §1608 of the Foreign Sovereign Immunities Act.  *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (citing *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 149–50 (D.C. Cir. 1994)).

## JURIDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1330.

Defendants are a foreign state as defined in 28 U.S.C. §1603(a) and are not entitled to immunity

under 28 U.S.C. §1605A.

6.      Venue lies in this Court pursuant to 28 U.S.C. §1391(f)(4).

## STATEMENT OF FACTS

7.      Afsaneh Azadeh was born in Tehran, Iran on April 12, 1969.  Ms. Azadeh

immigrated to the United States in 1991 and became a U.S. citizen in October 2004.

8.      On May 13, 2012, in the early morning, Ms. Azadeh arrived to Tehran's Imam

Khomeini International Airport on a trip to visit her mother, who at the time was seventy-eight

years old and was preparing to have cataract surgery.

9.      Ms. Azadeh walked from the plane to the airport's passport control area where a

government official examined her documents.  The official asked her to wait, then returned after

fifteen minutes and permitted her to continue to the baggage-claim area.

10.      Ms. Azadeh collected her bags. As she was exiting the airport, she was

surrounded by four men and a woman.  One of the men showed Ms. Azadeh a document which

had her photograph on it.  The man said the document was a warrant for Ms. Azadeh's arrest on

allegations that she presented a danger to "national security."  Upon information and belief,

issues of national security are handled by the Revolutionary Guard.

11.      Ms. Azadeh later learned that the five individuals who arrested her that day were

officials of the Government of the Islamic Republic of Iran, specifically, the Revolutionary

Guard.  The officials, acting within the scope of their office, employment, or agency, confiscated

Ms. Azadeh's luggage, phone, and laptop.  They blindfolded her, handcuffed her, and placed her

inside a car.  The female official sat with Ms. Azadeh in the backseat. She directed Ms. Azadeh to lay down with her head in the woman's lap so she would not be seen.  Ms. Azadeh asked the woman where she was being taken.  The woman said, flatly, Evin Prison.

12.     Evin Prison is an infamous prison located in northern Tehran and run by the Government of the Islamic Republic of Iran.  Human Rights Watch,  the international non-governmental organization that conducts research and advocacy on human rights has described Evin Prison as "a place to be feared" where "authorities use threats of torture, threats of indefinite imprisonment and torture of family members, deception and humiliation, multiple daily interrogations lasting up to five or six hours, denial of medical care, and denial of family visits."  According to Human Rights Watch, the prison compound consists of several buildings and is administered by agencies of the Government of the Islamic Republic of Iran including, among others, the Ministry of Intelligence and Security and the Revolutionary Guard.

13.     For nearly one hour, Ms. Azadeh remained blindfolded while a convoy of two cars drove her to the prison.  During the ride, her abductors demanded the passwords to her email and all of her electronic devices.

14.     Upon arriving at the prison, Ms. Azadeh was led into a cell that was approximately 6 feet by 9 feet, with high concrete walls.  There was no window and no electricity.  The only light that came in was through two small slits in the iron door of the cell. The cell smelled like trash and had an old, dirty carpet.  Ms. Azadeh later learned that the compound of Evin Prison where she was held was called Section 206 and was under the control of the Revolutionary Guard.

15.     For the next four months officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office,

employment, or agency, held Ms. Azadeh in solitary confinement in that cell, with nearly no human contact other than with her interrogators.  She was never allowed to contact her family and she never saw a lawyer.

16.     On her first night in Evin Prison, Ms. Azadeh had trouble breathing and begged repeatedly for help.  A prison guard took her to an infirmary where she was given pills that were described to Ms. Azadeh as "truth pills."  The pills, she was told, would relax her and force her to tell the truth.  For the remainder of her detention, officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, administered the pills to Ms. Azadeh three times per day, often waiting until she had swallowed the pills before the guards left the room.

17.      The first morning of her detention, prison guards blindfolded Ms. Azadeh, cuffed her hands and feet and drove her to another location, which on information and belief, was the Evin Prison courthouse.  She was taken before a prosecutor for the Government of the Islamic Republic of Iran who showed her a document and informed her that she had been accused of working for the CIA and helping an anti-government movement, known as the Green Revolution, receive funds from the CIA.

18.     The prosecutor rhetorically asked Ms. Azadeh if she knew the punishment for spying and then said, "we execute them, we have zero tolerance for people like you who are working for the Great Satan."  The Great Satan is the epithet used by the Government of the Islamic Republic of Iran and the Revolutionary Guard to refer to the United States.

19.     Though Ms. Azadeh denied ever having done anything against the Government of the Islamic Republic of Iran, the prosecutor dismissed her protest and ordered her to sign the

document.  Ms. Azadeh signed the paper in which she acknowledged the charges against her even as she continued to assert her innocence.

20.     The following day, Ms. Azadeh was taken to a room and placed before a bright light.  Two interrogators, who on information and belief were members of the Revolutionary Guard acting within the scope of their office, employment, or agency, questioned her.  One interrogator asked about Ms. Azadeh's personal life and told her that, if she did not cooperate, she would remain in Evin Prison for at least 10 years and that, by then, her mother would be dead and she would be an old woman with nothing left to live for.  The other interrogator sat silently in the room, saying nothing.

21.     A while later, another interrogator came in, and the first interrogator left.  The silent man remained in place.  The second interrogator asked Ms. Azadeh about the cargo airline company at which she had worked since May 2005 in various corporate roles.  At the time, the company had various contracts with the U.S. government, including with the U.S. Department of Defense to support U.S. troops in Afghanistan and Iraq.  The interrogator asked Ms. Azadeh about the kind of assistance her employer provided U.S. troops.  Ms. Azadeh told the interrogator she could not answer his questions because she was only involved in the administrative aspects of the business.

22.     The interrogators continued to demand that Ms. Azadeh confess to things she had not done or confirm information that was false or about which she had no knowledge.  She was told to confess that she was a CIA agent. She was also asked to identify the names and photos of various people, many of whom Ms. Azadeh did not know.  Ms. Azadeh proclaimed her innocence and told her interrogators she did not have the information they wanted, but it was to no avail.

23.     As this and subsequent interrogations made clear, Ms. Azadeh was detained and persecuted by officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, only because she worked for a company that had dealings with the U.S. government.  In their questioning of Ms. Azadeh, Iranian officials clearly did not view her as a security risk, but rather, as a possible source of information about her employer.  This sort of politically motivated harassment could not possibly justify Ms. Azadeh's detention or the abuse she suffered while in custody.  That abuse, which was constant for the duration of Ms. Azadeh's detention, constituted physical and mental torture.

24.     For the first six weeks of her detention, officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, interrogated Ms. Azadeh on a daily basis.  The interrogations started early in the morning and lasted twelve hours or more, with a thirty-minute break for lunch and prayers.  The prison guards came to her cell, blindfolded her, handcuffed her, and chained her feet.  Because of the chains on her feet, Ms. Azadeh could barely walk from the cell to the interrogation room.  Prison guards pushed her so that she would walk faster and on one occasion, a guard pushed her so hard that Ms. Azadeh fell down a flight of stairs, dislocating her shoulder.

25.     Officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, regularly awakened Ms. Azadeh in the middle of the night and dragged her to an interrogation room where she was asked the same set of questions over and over again.

26.     During her first week at Evin Prison, a prison guard took Ms. Azadeh to an interrogation room and placed her in a chair that faced a wall.  The interrogator, who on information and belief was an agent of the of the Revolutionary Guard acting within the scope of their office, employment, or agency, kicked the chair each time Ms. Azadeh gave a response that he did not like, causing Ms. Azadeh's face and body to hit the concrete wall in front of her.  By the end of the interrogation, Ms. Azadeh's face and knees were covered in blood, and she was badly bruised.

27.     On yet another occasion, interrogators, officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, told Ms. Azadeh to write her life story.  Over the course of four days, Ms. Azadeh produced lengthy written documents, about which her interrogators questioned her.  At one point, one interrogator accused her of wasting his time and threatened to take her to the women's public jail or to a prison on the border of Iran and Afghanistan.  There, he said, Ms. Azadeh would be raped, tortured, and never seen again.

28.     One night, officials took Ms. Azadeh to a room in Evin Prison's basement and told her to stand next to the wall.  A man, referred to as "Haj Agha," came into the room, carrying a long whip in his hand.  On information and belief, "Haj Agha" was an official of the Revolutionary Guard acting within the scope of his office, employment, or agency.  As another man interrogated her, Haj Agha's whip rested against Ms. Azadeh's legs, threatening to strike her at any moment.  "Haj Agha" and the other man began exchanging words about a picture they were looking at, which Ms. Azadeh later learned was a picture of her in a bathing suit.  They made comments about her figure and her attire, remarking repeatedly that women who wear bathing suits are worthy of being raped.  After standing for a long while, Ms. Azadeh's knees

began to hurt.  When she tried to sit down, "Haj Agha" whipped her legs.  Ms. Azadeh immediately stood back up to make the beating stop, at which point "Haj Agha" laughed, telling her he enjoyed the sight of her suffering.

29.     During this interrogation, Ms. Azadeh's was forced to look away from "Haj Agha" and the other interrogator. When Ms. Azadeh turned around to get a look at the two men, "Haj Agha" lashed her twice more, cursed at her, and walked out of the room.  As a result of "Haj Agha's" violent assaults, Ms. Azadeh suffered large bruises on her body.

30.     During the third week of her detention, around midnight, the prison guard who regularly took Ms. Azadeh to the interrogation entered the cell, handcuffed and blindfolded her, took her outside and forced her into a car.  The car eventually stopped and the guard guided Ms. Azadeh to a wall and told her to stand straight.  Then Ms. Azadeh heard the voice of one of her interrogators, an agent for the Revolutionary Guard acting within the scope of his office, employment, or agency, telling her that the government had no tolerance for "spies" like her, that she was an embarrassment as an Iranian and a Muslim woman, and that she was sentenced to die.

31.     The man screamed "do you want to confess everything?"  Ms. Azadeh remained silent and then heard the voices of men reciting verses from the Qur'an which are recited to the dying.  It was at this point that Ms. Azadeh realized that she had been sentenced to death.

32.     The interrogator instructed a firing squad to fire, and Ms. Azadeh heard ear-shattering shots.  When she awoke, she was in the prison infirmary.  She could not stop sobbing and as she was having difficulty breathing, the doctor ordered that she be transferred to a hospital.

33.     Ms. Azadeh remained in the hospital for several days.  Officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting

within the scope of their office, employment, or agency, did not allow her visitors, and the

hospital staff was forbidden from speaking with her.  When she was finally discharged and

returned to Evin Prison, the interrogator who had declared her death sentence threatened Ms.

Azadeh, saying "we gave you another chance to live; this is your last chance.  Think it through

and cooperate with us.  If you don't, next time you are going to die."

34.     On one occasion, officials, employees or agents of the Government of the Islamic

Republic of Iran and the Revolutionary Guard, acting within the scope of their office,

employment, or agency, attempted to poison Ms. Azadeh.   Soon after her evening meal, Ms.

Azadeh noticed that her body was itching.  After some time, she began coughing uncontrollably

and was covered in a rash that turned into blisters.

35.     Realizing her body was reacting to something she had eaten, Ms. Azadeh banged

on the cell door for help.  No one responded.  She began coughing uncontrollably and she was

breathing in labored gasps.  Other prisoners too began banging on their cell doors to alert the

prison guards that something was wrong.  By the time the prison guard appeared, Ms. Azadeh's

body was covered with rashes and her breathing was labored.  The prison guard took her to the

infirmary and the doctor asked why Ms. Azadeh had not sought help sooner.  Ms. Azadeh

explained that she had been knocking on the cell door for a very long time, but that no one had

responded.   Ms. Azadeh then heard the doctor scold the guard and tell her that she had

endangered the prisoner's life.

36.     The next day, Ms. Azadeh told her interrogator about the incident.  The

interrogator explained that Evin Prison was not a good place to die and that she could avoid

future incidents by giving her interrogators the information they wanted.

37.     During the tenth week of her detention, officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, subjected Ms. Azadeh to a second mock execution. This time, a woman was brought to her cell late at night to teach her how to pray and recite verses from the Qur'an.  In the middle of the lesson, the woman told Ms. Azadeh she had only a few hours before the guards would come to take her away and that she should pray and ask for God's forgiveness.

38.     For hours, Ms. Azadeh waited.  Finally, a guard came and forced Ms. Azadeh from the cell. She was handcuffed and blindfolded and a veil was thrown over her head.  The guard pushed her into a car and she was driven to a location where she was told to stand against a wall.  She was told she would be killed, unless she cooperated.  She heard the voice of her interrogator, an agent for the Revolutionary Guard, and again, the interrogator asked if she wanted to confess.  Again, she was frozen with grief and terror.  Again, she heard voices chanting the Qur'an, and again, she heard ear shattering gun shots.

39.     The last thing she recalls before losing consciousness was people moving.  She could hear their voices, but she was unable to determine what was being said.  She awoke in a hospital where she remained for three days.

40.     Throughout her detention officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, repeatedly used Ms. Azadeh's family as a pawn to psychologically torture her.  Officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, never once allowed Ms. Azadeh to speak or meet with her family, though the chance of doing so

was repeatedly dangled in front of her.  On multiple occasions, Ms. Azadeh was told she could contact her family members, only to be refused access at the last minute.

41.     The stress and anxiety of her detention caused Ms. Azadeh to suffer from depression and various physical problems, including heart palpitations and shortness of breath, for which she never received medical care.  After every lunch and dinner, officials, employees or agents of the Revolutionary Guard, acting within the scope of their office, employment, or agency would give Ms. Azadeh, as well as other prisoners, "truth pills," a practice commonly used to extract confessions.  The prison guard would stand in front of Ms. Azadeh and force her to swallow the pills in her presence.  After several months, the guard stopped waiting to watch Ms. Azadeh take the pills and instead simply handed her the pills and a small cup and walked away.  It was at that point that Ms. Azadeh stopped taking the pills.  She collected them and saved them in a tissue that she kept under the carpet of her cell.

42.     One evening, after weeks of physical and mental abuse, Ms. Azadeh attempted to end her life by ingesting in one sitting all the pills she had collected.  The guards found Ms. Azadeh unconscious and she was rushed to the hospital where the doctors pumped her stomach.  She remained in the hospital for one week, during which time neither nurses nor doctors were allowed to speak to her.

43.     In the twelfth week of her incarceration, officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, told Ms. Azadeh that she would be released if she signed over the deed to her mother's house, which she did.  A week later, Ms. Azadeh still had not been freed from jail.  She was exhausted, physically and mentally.  To protest her continued imprisonment, Ms. Azadeh staged a hunger strike which lasted for one week before officials,

employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, took her to the infirmary and force-fed her.

44.     Finally, on September 2, 2012, in the sixteenth week of her detention, Ms. Azadeh was taken to a room where her interrogators, officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, dictated a confession which they instructed her to write and sign.  In the confession, Ms. Azadeh falsely confessed to being a CIA agent and to engaging in activities against Iran, supported by the U.S. government.  Even though the confession was false, Ms. Azadeh signed it because she could no longer tolerate the mental and physical torture of being held in Evin Prison.

45.     The prison guard took Ms. Azadeh back to her cell, returned her clothes, and took her to the infirmary.  There, she was examined by a doctor, who took her blood pressure and weighed her.  During her four months in Evin Prison, Ms. Azadeh had lost twenty-five pounds.

46.     When she was finally reunited with her family, Ms. Azadeh could not stop crying. She wept for days and was unable to meet with people or engage in conversation.  Though friends and family came to see her, Ms. Azadeh could not stand to talk.  She could not tolerate the presence of others even though she had longed for so many months to be in the presence of her family and friends.  That feeling of being withdrawn, or living life at a remove, continues to this day.

47.     As a condition of her release, officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, placed Ms. Azadeh under house arrest for two months.

48.     Several weeks after Ms. Azadeh was released from home detention, as she was returning home from an appointment with an attorney, officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, drove their car into her.  As Ms. Azadeh was walking on the sidewalk, a good distance away from the street, a car veered off the street and drove directly toward her.  Following that incident, Ms. Azadeh was hospitalized for a week with a fractured pelvis.  The next time she was in the prosecutor's office, the prosecutor said "I told you to stay home.  You don't know the city, and it can be very dangerous."

49.     Officials, employees or agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, used solitary confinement, physical abuse, mental abuse, mock executions, threats against Ms. Azadeh's life, poison and drugs in order to force her to make a false confession regarding the CIA and Iranian opposition groups.  Throughout her time in prison, Ms. Azadeh was never permitted to contact her family or a lawyer.   Indeed, at a certain point, Ms. Azadeh's mother was told that Ms. Azadeh was dead.

50.     Ms. Azadeh's detention caused her severe and extreme psychological distress both during her imprisonment and after her release.  Ms. Azadeh's confinement and torture caused her to experience severe depression and led to two suicide attempts.  Following her release, Ms. Azadeh continues to suffer from the mental and physical torture that she experienced while in the custody of the Government of the Islamic Republic of Iran and the Revolutionary Guard.

## COUNT I

### (PERSONAL INJURIES CAUSED BY TORTURE:
### 28 U.S.C. § 1605A)

51.     Paragraphs 1 through 50 above are incorporated as if set forth herein.

52.     Under 28 U.S.C. § 1605A, Ms. Azadeh has a private, federal right of action against the  Government of the Islamic Republic of Iran and the Revolutionary Guard, for committing acts of torture against her.

53.     In order to bring a claim under 28 U.S.C. § 1605A, four elements must be satisfied, all of which are met here:

(a)     As of January 19, 1984, the Government of the Islamic Republic of Iran, including the Revolutionary Guard, has been designated a state sponsor of terrorism by the U.S. Secretary of State.  *See* 49 Fed. Reg. 2836 (Jan. 23, 1984);

(b)     Ms. Azadeh was a U.S. citizen at the time of her imprisonment and torture and was therefore a national of the United States;

(c)     The statute requires at 28 U.S.C. § 1605A(a)(2)(iii) that a claimant afford the foreign state a reasonable opportunity to arbitrate the claim if the actions giving rise to the lawsuit occurred in that foreign state.  Simultaneously with the filing of the pleadings and the service of the Complaint, Plaintiff is providing Defendants an Offer to Arbitrate the claim; and

(d)     The Plaintiff's allegations amount to "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

54.     The definition of "torture" under Section 1605A, which is derived from Section 3(b) of the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1991, codified at 28 U.S.C. § 1350 (note)), includes:

> Any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

55.      Under Section 1605A(c), a foreign state is held vicariously liable for the acts of its officials, employees, or agents.

56.     The officials, agents and employees of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, intentionally subjected Ms. Azadeh to four months of severe pain and suffering, solitary confinement, mock executions, physical and mental abuse, and threats against her life, all with the intent of obtaining a false confession and extracting information about Ms. Azadeh's employer.  The conduct of officials of the Government of the Islamic Republic of Iran and the Revolutionary Guard, whose agents were acting within the scope of their office, employment, or agency, constitutes torture, as defined under the FSIA and TVPA.

57.     For all the reasons alleged in this Complaint, the officials, agents and employees of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, caused Ms. Azadeh to suffer extreme mental and physical anguish and pain.

58.     Ms. Azadeh continues to suffer physical and psychological harm to this day as a result of the treatment she received while in the custody of the Government of the Islamic Republic of Iran and the Revolutionary Guard.

59.     The Government of the Islamic Republic of Iran and the Revolutionary Guard are therefore liable to Ms. Azadeh for the full amount of her damages, in such sum as they may be hereinafter determined.

60.     The conduct of the Government of the Islamic Republic of Iran and the Revolutionary Guard was outrageous, extreme, intentional, malicious, and showed a reckless disregard for the health and safety of Ms. Azadeh, warranting an award of punitive damages.

## COUNT II

### (§ 1605A(c) CAUSE OF ACTION - ASSAULT AND BATTERY)

61.     Paragraphs 1 through 50 above are incorporated as if set forth herein.

62.     The officials, employees and agents of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, committed or are responsible for numerous acts of assault and battery upon Ms. Azadeh during her confinement and torture.

63.     Under the FSIA, a foreign state that is stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

64.     Because of their acts of torture, the Government of the Islamic Republic of Iran and the Revolutionary Guard are stripped of their immunity under the FSIA and are liable for torts in the same manner and to the same extent as private individuals.

65.     Defendants physically assaulted Ms. Azadeh and took actions intended to make Ms. Azadeh believe she would be physically harmed.  Defendants also intended harmful or offensive contact with Ms. Azadeh without her consent.  Defendants' conduct included intentionally and repeatedly threatening Ms. Azadeh's life, threatening bodily injury, and physically attacking Ms. Azadeh.

66.     For all the reasons alleged in this Complaint, the officials, agents and employees of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, caused Ms. Azadeh to suffer extreme mental and physical anguish and pain.

67.     Ms. Azadeh continues to suffer physical and psychological harm to this day as a result of the treatment she received while in the custody of the Government of the Islamic Republic of Iran and the Revolutionary Guard.

68.     The Government of the Islamic Republic of Iran and the Revolutionary Guard are therefore liable to Ms. Azadeh for the full amount of her damages, in such sum as they may be hereinafter determined.

69.     The conduct of the Government of the Islamic Republic of Iran and the Revolutionary Guard was outrageous, extreme, intentional, malicious, and showed a reckless disregard for the health and safety of Ms. Azadeh, warranting an award of punitive damages.

## COUNT III

### (§ 1605A(c) CAUSE OF ACTION –
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

70.     Paragraphs 1 through 50 above are incorporated as if set forth herein.

71.     The officials, agents and employees of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or

19

agency, caused Ms. Azadeh severe emotional distress when they staged mock executions and used threats and physical abuse, solitary confinement, and restrictions on Ms. Azadeh's contact with her mother and other relatives, to coerce a confession.  Their behavior violated acceptable norms of treatment under both U.S. and international law and was intentional and reckless, extreme and outrageous.

72.     For all the reasons alleged in this Complaint, the officials, agents and employees of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, caused Ms. Azadeh to suffer extreme mental and physical anguish and pain.

73.     Ms. Azadeh continues to suffer physical and psychological harm to this day as a result of the treatment she received while in the custody of the Government of the Islamic Republic of Iran and the Revolutionary Guard.

74.     The Government of the Islamic Republic of Iran and the Revolutionary Guard are therefore liable to Ms. Azadeh for the full amount of her damages, in such sum as they may be hereinafter determined.

75.     The conduct of the Government of the Islamic Republic of Iran and the Revolutionary Guard was outrageous, extreme, intentional, malicious, and showed a reckless disregard for the health and safety of Ms. Azadeh, warranting an award of punitive damages.

## COUNT IV

### (§ 1605A(c) CAUSE OF ACTION - FALSE IMPRISONMENT)

76.     Paragraphs 1 through 50 above are incorporated as if set forth herein.

77.     Ms. Azadeh was deprived of liberty without cause and without legal justification. Officials, employees and agents of the Government of the Islamic Republic of Iran and the

Revolutionary Guard, acting within the scope of their office, employment, or agency, held Ms. Azadeh in detention even though they knew they had no basis to do so.

78.     For all the reasons alleged in this Complaint, the officials, agents and employees of the Government of the Islamic Republic of Iran and the Revolutionary Guard, acting within the scope of their office, employment, or agency, caused Ms. Azadeh to suffer extreme mental and physical anguish and pain.

79.     Ms. Azadeh continues to suffer physical and psychological harm to this day as a result of the treatment she received while in the custody of the Government of the Islamic Republic of Iran and the Revolutionary Guard.

80.     The Government of the Islamic Republic of Iran and the Revolutionary Guard are therefore liable to Ms. Azadeh for the full amount of her damages, in such sum as they may be hereinafter determined.

81.     The conduct of the Government of the Islamic Republic of Iran and the Revolutionary Guard was outrageous, extreme, intentional, malicious, and showed a reckless disregard for the health and safety of Ms. Azadeh, warranting an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.     Enter judgment against Defendant the Islamic Republic of Iran and Defendant the Revolutionary Guard in favor of Plaintiff for compensatory damages, including for economic damages, solatium, and pain and suffering.

B.     Enter judgment against Defendant the Islamic Republic of Iran and Defendant the Revolutionary Guard in favor of Plaintiff for punitive damages.

C.     Award reasonable attorney's fees and costs, including expert fees and interest.

D.      Provide any other further relief the Court deems just and proper.

Dated:  July 18, 2016                                  Respectfully submitted,


                                                       /s/ Kirby D. Behre
                                                       Kirby D. Behre (D.C. Bar # 398461)
                                                       Laura G. Ferguson (D.C. Bar #433648)
                                                       Lamia R. Matta (D.C. Bar # 484444)
                                                       Miller & Chevalier Chartered
                                                       900 16th Street, NW
                                                       Washington, D.C. 20006
                                                       Tel:    (202) 626-5800
                                                       Fax:    (202) 626-5801
                                                       Email: kbehre@milchev.com
                                                       Email: lferguson@milchev.com
                                                       Email: lmatta@milchev.com