# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ASFANEH AZADEH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-1467 (KBJ) |
| | ) | |
| GOVERNMENT OF THE ISLAMIC | ) | |
| REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION ADOPTING
## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

On July 18, 2016, Plaintiff Asfaneh Azadeh commenced this tort action against

Defendants the Government of the Islamic Republic of Iran and the Army of the

Guardians of the Islamic Revolution (collectively "Defendants") for the "uncontested

and inhumane atrocities she suffered during the three months she spent wrongfully

imprisoned in an Iranian jail." *Azadeh v. Gov't of Islamic Republic of Iran*, 16-cv-

1467, 2018 WL 3381306, at *1 (D.D.C. July 11, 2018). Currently pending before this

Court is Azadeh's renewed motion for a default judgment against Defendants and also

Magistrate Judge Michael Harvey's Report and Recommendation regarding that motion.

(*See* Pl.'s Renewed Mot. for Default J., ECF Nos. 13 & 40; Report and

Recommendation ("R & R"), ECF No. 27.) Because Azadeh has successfully effected

service upon Defendants in accordance with section 1608(a) of Title 28 of the United

States Code, this Court now has the personal jurisdiction and subject-matter jurisdiction

necessary to consider both the merits of Azadeh's claims and the Magistrate Judge's

recommendations. *See Azadeh*, 2018 WL 3381306, at *1.

In his comprehensive Report and Recommendation, Magistrate Judge Harvey evaluated the undisputed and harrowing facts that Azadeh established, and he concluded that Defendants are liable for assaulting, battering, falsely imprisoning, and intentionally inflicting emotional distress upon Azadeh. (*See* R & R at 33–38.) Magistrate Judge Harvey also addressed the damages that should be awarded to Azadeh, concluding that Plaintiff is entitled to the following: $13,028,889 for her pain and suffering; $5,176,733 for her economic damages; and $18,205,622 for her punitive damages; for a total damages award of $36,411,244. (*Id.* at 52; *see also id.* at 38–52.) The Report and Recommendation also advises the parties that, "failure to file timely objections to the findings and recommendations set forth in this report may waive [the parties'] right of appeal from an order of the District Court that adopts such findings and recommendations." (*Id.* at 52–53); *see Thomas v. Arn*, 474 U.S. 140, 154 (1985); *see also Gov't of Rwanda v. Johnson*, 409 F.3d 368, 376 (D.C. Cir. 2005) ("[O]bjections to magistrate rulings are forfeited absent timely challenge in the district court.").

Having considered these conclusions and the analysis supporting them, this Court agrees with Magistrate Judge Harvey's findings and **ADOPTS** his analysis and conclusions regarding the Defendants' liability and the appropriate amount of damages to be awarded to Azadeh. Consequently, consistent with the attached Report and Recommendation and as set forth in the accompanying Order, Azadeh's renewed motion for a default judgment will be **GRANTED**, and damages will be awarded in the amount of $36,411,244.

DATE: September 5, 2018

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

**APPENDIX A**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————

                         )

**AFSANEH AZADEH**           )

                         )

          **Plaintiff,**      )

                         )

**v.**                        )        **Case No. 16-cv-1467(KBJ/GMH)**

                         )

**THE GOVERNMENT OF THE**  )

**ISLAMIC REPUBLIC OF IRAN,** *et al.*,  )

                         )

          **Defendants.**    )

———————————————————)

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned for full case management. Plaintiff Afsaneh Azadeh brought this action under the Foreign Sovereign Immunities Act's ("FSIA") state sponsor of terrorism exception. 28 U.S.C. § 1605A. She seeks to hold the Government of the Islamic State of Iran and the Army of the Guardians of the Islamic Revolution to account for the abuse and torment—and as the undersigned finds below, torture—that she suffered during nearly four months of detention at Iran's notorious Evin Prison in 2012.

While at Evin Prison, Plaintiff was locked in a small, windowless cell, and subjected to daily interrogations seeking to elicit a false confession that she was an agent for the U.S. Central Intelligence Agency ("CIA") engaging in activities against Iran. Prison officials whipped her, repeatedly hit her head against a wall, and pushed her down stairs. They subjected her to two mock executions. They drugged her and threatened to transfer to other prisons where she would be raped, tortured and never seen again. They detained her fiancé and told her that if she did not confess that he would be subjected to the same treatment she was experiencing. They also falsely

told her that her mother had died after hearing news that Plaintiff had been executed. Not surprisingly, Plaintiff experienced substantial pain and suffering while she was imprisoned. She experience panic attacks, ████████████ d in a week-long hunger strike, ████. ████████. Since her release, she continues to suffer the effects of her incarceration, including permanent injuries to her shoulder and head, ████████████████████████. In this action, she seeks an award of compensatory and punitive damages against Defendants for the physical and emotional injuries she has suffered.

As neither Defendant filed a response to the complaint within 60 days of service as required by 28 U.S.C. § 1609(d), Plaintiff has moved for entry of a default judgment. [Dkt. 10]. After a thorough review of the record evidence, and consideration of this Court's case law adjudicating analogous actions against foreign sovereigns, the undersigned **RECOMMENDS** that Plaintiff's Motion for Default Judgment be **GRANTED,** and that Plaintiff be awarded $18,205,622 in compensatory damages, and an equal amount of punitive damages, for a total of $36,411,244.

## I. LEGAL STANDARD FOR ENTRY OF A DEFAULT JUDGMENT AGAINST A FOREIGN SOVEREIGN

The Federal Rules of Civil Procedure grant district courts discretion to enter a default judgment upon a party's motion. Fed. R. Civ. P. 55(b)(2). A default judgment is normally available, as here, when "the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (internal quotation marks omitted). The party seeking the judgment must demonstrate that the court has both subject matter jurisdiction over the action and personal jurisdiction over the absent defendant. *See Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016); *Mwani v. bin Laden*, 417 F. 3d 1, 6 (D.C. Cir.

2005). Additionally, before a default judgment can be entered against a foreign sovereign, the FSIA requires a plaintiff to "establish[] his claim or right to relief by evidence satisfactory to the court." *Thuneibat*, 167 F. Supp. 3d at 33 (quoting 28 U.S.C. § 1608(e)). A court must thoroughly review a plaintiff's allegations and evidence against an absent foreign sovereign. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014); *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 16–17 (D.D.C. 2016). While a court "may not unquestioningly accept a complaint's unsupported allegations as true," *Reed v. Islamic Republic of Iran*, F. Supp. 2d 204, 211 (D.D.C. 2012), "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *Thuneibat*, 167 F. Supp. 3d at 33; *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015). An evidentiary hearing is not required; rather, a "plaintiff may establish proof by affidavit." *Reed*, 845 F. Supp. 2d at 212; *see also Mwani*, 417 F.3d at 7 ("In the absence of an evidentiary hearing, although the plaintiffs retain 'the burden of proving personal jurisdiction, [they] can satisfy that burden with a *prima facie* showing.' . . . [T]hey may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991))). The court may also "take judicial notice of related proceedings and records in cases before the same court." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 43 (D.D.C. 2008).

## II.     PROCEDURAL HISTORY

Plaintiff filed suit against Defendants in July 2016 under the FSIA's state sponsor of terrorism exception to foreign sovereign immunity. *See* 28 U.S.C. § 1605A. Plaintiff initially effected serviced on Defendants only through diplomatic channels pursuant to section 1608(a)(4),

and not by first attempting service by mail pursuant to section 1608(a)(3). [Dkt. 5-1]. Specifically, Plaintiff provided translated copies of the summons, complaint and notice of suit, to the Clerk of Court for delivery by the U.S. Department of State to the Iranian Ministry of Foreign Affairs. [Dkt. 5]. The State Department confirmed the documents were delivered to the Iranian Ministry of Foreign Affairs, via diplomatic channels, on January 17, 2017 under diplomatic note.[1] [Dkt. 8]. Neither Defendant filed a response within 60 days of service as required by 28 U.S.C. § 1609(d). On March 23, 2017, at Plaintiff's request, the Clerk of Court declared Defendants in default pursuant to Fed. R. Civ. P. 55(a). [Dkt. 10; Dkt. 11].

On April 23, 2018, citing to recent decisions from this Court that have held that service on Iran many not be perfected solely via diplomatic channels pursuant to section 1608(a)(4) and have required service to be attempted via mail pursuant to section 1608(a)(3), the undersigned ordered Plaintiff to show cause as to why her motion for default judgment should not be denied for failure of service on Defendants. [Dkt. 17]. In response, Plaintiff attempted service by mail on Defendants pursuant to section 1608(a)(3). [Dkt. 21; Dkt. 22]. The Clerk of the Court mailed translated copies of the summons, complaint, and notice of suit to the Iranian Ministry of Foreign Affairs on May 8, 2018. [Dkt. 23]. The Iranian Ministry of Foreign Affairs refused service on May 20, 2018. [Dkt. 25].

Accordingly, the undersigned now turns to Plaintiff's motion for a default judgment pursuant to 28 U.S.C. § 1608(e). [Dkt. 13]. As Plaintiff's briefing in support of her motion is comprehensive, the undersigned finds that an evidentiary hearing on the motion is unnecessary.[2] *See*

---

[1] Pursuant to 28 U.S.C. § 1608(c)(1), service shall be deemed to have been made as of the date of transmittal stated in the certified copy of the diplomatic note.

[2] To establish the legal and factual bases for her claim, Plaintiff submitted her own declaration describing her detention and its impact on her life. [Dkt. 12-2]. Her account is corroborated by declarations from her mother [Dkt. 12-3], ███, ████████ ███████ ], and her former co-workers, Ray Adams [Dkt. 12-7] and Mahmoud Awad [Dkt.

*Reed*, F. Supp. 2d at 212 ("[A] plaintiff may establish proof by affidavit."); *Kilburn v. Islamic*

*Republic of Iran*, 699 F. Supp. 2d 136, 150 (D.D.C. 2010) ("In assessing the plaintiffs' evidence,

this court may 'accept as true the plaintiff's uncontroverted evidence.'" (quoting *Elahi v. The*

*Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000))). The undersigned's findings

---

12-8]. Plaintiff also submits the declarations of experts on the Islamic Republic of Iran, the international law applicable to torture, and the psychiatric effects of confinement, as well as an economic loss report by a forensic economist. [Dkt. 13-5; Dkt. 13-12; Dkt. 12-4; Dkt. 12-9].

The undersigned finds that each of Plaintiff's proffered experts are qualified to provide testimony in their areas of expertise pursuant to Federal Rule of Evidence 702. Plaintiff's proffered expert on the Islamic Republic of Iran, Hadi Ghaemi, is the founder and Executive Director of the Center for Human Rights in Iran and a member of the Council on Foreign Relations. [Dkt. 13-5]. Dr. Ghaemi was awarded a MacArthur Foundation grant in 2002 and a Rockefeller Foundation grant in 2000 to fund his research on the Islamic Republic of Iran. Dr. Ghaemi also authored a review of the Islamic Judiciary in Iran, a chapter of "The Iran Primer," a publication by the United States Institute of Peace. He has written articles on Iran for the Washington Post, Wall Street Journal, and New York Times, and in June 2016, his organization published "*Inside the Women's Ward: Mistreatment of Women Political Prisoner's in Iran's Evin Prison.*" Dr. Ghaemi received his Ph.D. in Physics from Boston University and served as a professor of physics at the City University of New York from 1998–2000.

Plaintiff's expert on the international law applicable to torture, Juan E. Méndez, is a Professor of Human Rights Law in residence at American University–Washington College of Law. Professor Méndez served as the United Nation's Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment from 2010–2016. [Dkt. 13-12]. Special Rapporteurs are appointed to serve the United Nations on the basis of their expertise in the respective subject matter covered by their mandates. During his tenure, Professor Méndez authored ninety-six observation reports on Iran which outlined the various treatment and conditions in Iranian prisons that rose to the level of torture under international law. Prior to this, Méndez served as the Special Advisor to the Prosecutor of the International Criminal Court, co-chair of the Human Rights Institute of the International Bar Association, President of the International Center for Transitional Justice, and Special Advisor to the U.N. Secretary General on the Prevention of Genocide. Professor Méndez earned his J.D. from Stella Maris University in Argentina and is a member of the District of Columbia bar.

Plaintiff's expert on the psychiatric effects of confinement, Dr. Stuart Grassian, served as a clinical instructor in psychiatry at Harvard Medical School for more than twenty-five years. [Dkt. 12-4]. Dr. Grassian has extensive experience evaluating the psychiatric effects of confinement, confinement under the sentence of death, and of coercive interrogation practices. He has published several scholarly articles on the topic, including a chapter in *The Trauma of Psychological Torture* (Ojeda ed., 2008). Dr. Grassian's conclusions and findings have been cited in a number of federal court decisions, including at least one Supreme Court opinion. *See Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring). Dr. Grassian is a board-certified psychiatrist licensed to practice in Massachusetts.

Plaintiff's proffered forensic economist, Dr. Jerome Paige, received his Ph.D. in Economics from American University in 1982 and has served on the faculty of the National Defense University (1996–2002), the University of Baltimore (1990–1996), and the University of the District of Columbia (1977–1990). [Dkt. 12-9]. Dr. Paige has been providing services as a forensic economist for more than thirty years and has testified as a forensic economic expert in numerous regulatory proceedings as well as private litigation. Paige has published widely on the topic of economic damages, including *The Importance of the Relationship Between Growth Rate & Discount Rates in Assessing the Value of Economic Damages*, 83 J. OF APPLIED BUS. AND ECON., Vol. 19(3) (2017). Richard Lockley, who co-authored Plaintiff's economic loss report with Dr. Paige, received his MBA from the University of Chicago School of Business and has been providing financial consulting services for more than twenty years.

of fact and conclusions of law in support of a default judgment against both Defendants follow below.

### III.     FINDINGS OF FACT

#### A.     Afsaneh Azadeh

Plaintiff is a dual United States and Iranian citizen who was born in Tehran, Iran in 1969. [Dkt. 12-2, ¶ 1]. She was raised in Iran along with her five siblings. *Id.* She left Iran at age twenty to attend university in Paris, where she studied language and graphic design. *Id.* ¶ 3. After obtaining her college degree in France, Plaintiff immigrated to California in 1991, where she lived for the next thirteen years. *Id.* She became a United States citizen in October 2004. *Id.*

In 2005, Plaintiff accepted a position at HeavyLift International ("HeavyLift"), an airplane cargo transport company based in the United Arab Emirates ("U.A.E."). *Id.* ¶ 4. As a result, Plaintiff was required to relocate to Dubai. *Id.* Throughout her employment with HeavyLift, Plaintiff's mother lived in Tehran and Plaintiff regularly traveled from Dubai to Tehran to visit her. *Id.* ¶ 5. In 2010, Plaintiff was promoted to HeavyLift's General Manager and Accountable Manager. *Id.* ¶ 6.

#### B.     Plaintiff's Abduction in Iran

In 2012, Plaintiff became engaged to a man she met in Tehran, whom she visited whenever she traveled there. *Id.* ¶ 7. In May 2012, Plaintiff traveled to visit her fiancé and to finalize wedding preparations. *Id.* ¶ 8. Plaintiff arrived at Tehran's Imam Khomeini International Airport on May 13, 2012. *Id.* At the time of her arrival in Iran, ███████████████████████. *Id.* ¶ 7. She was kept at the airport's passport control area for fifteen minutes while an Iranian government official examined her documents, but was ultimately permitted to continue to baggage claim. *Id.* ¶ 9. After collecting her bags, Plaintiff proceeded to the exit, but before she was able to leave,

she was surrounded by four men and one woman, all of whom were later determined by Plaintiff to be officials of Defendant Army of the Guardians of the Islamic Revolution, also known as the Islamic Revolutionary Guard Corps ("the Revolutionary Guard"). *Id*. ¶ 10. One of the men presented Plaintiff with a document with her picture on it. *Id*. She was not permitted to read the document despite her request. *Id*. Plaintiff was told the document was a warrant for her arrest based on allegations that she "presented a danger to national security." *Id*. At that point, Plaintiff's luggage and personal items were confiscated and she was blindfolded, handcuffed, and placed inside a car. *Id*. ¶ 11.

During the drive, the officials demanded that Plaintiff give them the passwords to her email and electronic devices. *Id*. ¶ 14. When Plaintiff asked where she was being taken, one of the officials told her that she was being brought to Evin Prison. *Id*. ¶ 11. Plaintiff became unable to catch her breath and—for the first time in her life—began to experience a panic attack. *Id*. ¶ 12.

### C. Plaintiff's Detention in Evin Prison

Evin is a notoriously brutal prison located in northwestern Tehran. [Dkt. 12-2, ¶ 13; Dkt. 13-5, ¶ 19]. According to one of Plaintiff's experts, during interrogation sessions at Evin, "interrogators routinely inflict various forms of torture, physical abuse, and ill-treatment on the detainee." [Dkt. 13-5, ¶ 28]. The prison is operated by the State Prison and Security and Corrective Measures Organization which is under the authority of the Iranian Judiciary. *Id*. ¶ 19. The Iranian Judiciary is part of the Iranian government and answers to the Supreme Leader Ayatollah Khamenei. *Id*.

The Revolutionary Guard is a branch of Iran's armed forces and is responsible for internal and border security. [Dkt. 12-1 at 11; Dkt. 13-5, ¶ 18]. There are certain wards of Evin Prison

which are under the autonomous control of the Revolutionary Guard. [Dkt. 13-5, ¶¶ 18–19; Dkt. 12-2, ¶ 15]. Upon arriving at the prison, Plaintiff was taken to one of the cells in a section of the prison under the control of the Revolutionary Guard. [Dkt. 12-2, ¶ 15]. Plaintiff's cell was small and windowless. It was approximately 6 feet by 9 feet with high concrete walls, no electricity, and lit only through two small slits in the iron door of her cell. *Id.* The cell had a squat toilet in the floor and an old, dirty carpet. *Id.* Upon seeing her cell, Plaintiff began to have trouble breathing and experienced another panic attack. *Id.* ¶ 16. At that moment, she "thought [she] was going to die." *Id.*

After several hours, her repeated entreaties for help eventually prompted a prison guard to take her to an infirmary, where she was given a so-called "truth pill." *Id.* The doctor told her that the pills would relax her and force her to tell the truth.[3] *Id.* Plaintiff would be forced to take the "truth pills" three times a day for the remainder of her detention. *Id.*

Upon her arrival at Evin Prison, Plaintiff was forced to change into pink prison pajamas, an old white t-shirt, a long coat, and a chador to cover her hair and face. *Id.* ¶ 17. Having been forced to wear a chador, Plaintiff became concerned as to how the guards would react to her red acrylic nails. *Id.* ████████████████████████████████████████
████████████████████ *Id.*

The next morning, she was taken to the courthouse of Evin Prison and presented before a prosecutor for the Iranian government, who told her that she had been accused of working for the CIA and of helping an Iranian anti-government movement known as the Green Revolution. *Id.* ¶

---

[3] One of Plaintiff's experts believes the pills were a type of benzodiazepine. [Dkt. 12-4, ¶ 34 n.1]. Benzodiazepines are a type of tranquilizer and are commonly prescribed under brand names such as Valium or Xanax. *See* WebMD, Benzodiazepine Abuse, https://www.webmd.com/mental-health/addiction/benzodiazepine-abuse#1 (last visited Jan. 3, 2018).

18.  The prosecutor told Plaintiff that the punishment for spying was execution and that, "we have zero tolerance for people like you who are working for the Great Satan."[4]  *Id.*  Plaintiff signed a paper acknowledging the charges against her, even though she continued to assert her innocence.  *Id.* ¶ 19.

On the second day of Plaintiff's detention, two interrogators took her to a room located underneath the prison, where she was questioned for nine hours.  *Id.* ¶ 20.  Once in the room, the interrogators again accused her of being a spy, stating "[w]e have enough documents to keep you here 10 years.  And if we prove you are a spy, we will execute you."  *Id.*  The interrogators were angry and aggressive, which caused Plaintiff to have another panic attack, after which one of the interrogators gave her a ten-minute break and some pills before continuing her questioning.  *Id.*

The interrogator asked her questions about her employment with HeavyLift, specifically about the company's contracts with the U.S. Department of Defense to provide food supplies to U.S. troops in Afghanistan and Iraq.  *Id.* ¶ 21.  At the time, the company had various contracts with the U.S. government, including ones with the U.S. Department of Defense to support U.S. troops.  *Id.*  The interrogator asked her about the kind of assistance her employer provided the United States.  She told the interrogator that HeavyLift delivered only food supplies, but the interrogator insisted that she was a CIA agent providing some other kind of assistance on behalf of the United States.  *Id.*  It was clear to Plaintiff that they were detaining and questioning her because she worked for a company that had dealings with the U.S. government.  The interrogators repeatedly demanded that she confess to things she had not done, including demanding that she identify the names and photos of various people whom she did not know.  *Id.* ¶ 22.

---

[4] The "Great Satan" is an epithet used by the Government of the Islamic Republic of Iran and the Revolutionary Guard to refer to the United States.

After the first week of Plaintiff's detention, the guards took her to another small, window-less cell in the prison. *Id*. ¶ 23. This second cell was the same size as her previous cell—6 feet by 9 feet—but it contained neither a bed nor a toilet. *Id*. Plaintiff slept on an insect-infested rug on the floor; insect bites frequently prevented her from being able to sleep at night and left welts on her body. *Id*. The cell also contained a bright blue light that was lit twenty-four hours a day, making it difficult for her to sleep. *Id*. Plaintiff remained in this cell for the remainder of her detention. *Id*.

Plaintiff was interrogated every day for the next six weeks of her detention, often for pe-riods of twelve hours or more. *Id*. ¶ 24. These interrogations would begin with a prison guard blindfolding and handcuffing Plaintiff and chaining her feet, after which the guard would force her to walk to the interrogation room. *Id*. Her captors regularly woke her in the middle of the night and took her to the interrogation room to ask her the same set of questions repeatedly. *Id.*

During an interrogation that occurred during Plaintiff's first week of detention, the guards placed her in a chair that faced a wall. *Id.* ¶ 25. When the interrogator was displeased with an answer she provided, the interrogator would kick the chair, causing her face and body to strike the concrete wall in front of her. *Id*. During this interrogation session, Plaintiff was kicked into the wall five or six times, bloodying her face and knees and resulting in severe headaches, dizzi-ness, blurred vision, and nausea. *Id*.

Approximately one week later, Plaintiff was walking slowly down a flight of stairs be-cause of sciatic nerve pain from her beating the week before. *Id*. ¶ 26. Annoyed, a prison guard pushed Plaintiff, handcuffed and blindfolded, down a flight of stairs. *Id*. Because she was hand-cuffed, she could not break her fall, and her head slammed into the concrete stairs and wall and her right shoulder became dislocated. *Id*. Plaintiff became dizzy, experienced a headache, and

was unable to stand. *Id.* Eventually she was taken to the infirmary and given some pain medication, but she was not treated for the underlying injuries to her head or shoulder. *Id.*

On another occasion, Plaintiff was brought to an interrogation room and forced to stand against a wall. *Id.* ¶ 31. A man came into the room with a long whip. *Id.* When Plaintiff's knees began to hurt during the interrogation from standing and she tried to sit down, the man would whip her legs to prevent her from doing so. *Id.* He told her that he enjoyed seeing her suffer. *Id.* The interrogators also made comments about Plaintiff's body and attire, having found a photo of her in a bathing suit. *Id.* They told Plaintiff that women who wear bathing suits were worthy of being raped. *Id.* She was whipped twice more during the interrogation session for merely looking at the man who was whipping her. *Id.* The beatings resulted in large bruises all over her body. *Id.*

On another occasion, shortly after eating her evening meal, Plaintiff's body became covered in a rash and she began coughing uncontrollably. *Id.* ¶ 32. Realizing she was having a life-threatening reaction to something she had eaten, she pleaded for help and banged on the cell door, but the prison guards ignored her. *Id.* Only after other prisoners began to bang on their cell doors did a prison guard come to Plaintiff's cell, by which point her breathing was labored. *Id.* She was taken to the infirmary, where a doctor scolded the guard for endangering Plaintiff's life. *Id.* The next day, her interrogator told her that Evin Prison "was not a good place to die" and that she "could avoid further harm" by giving the interrogators what they wanted. *Id.* For this reason, Plaintiff believes she was intentionally poisoned by prison officials. *Id.*

During the third week of Plaintiff's detention, she was subjected to a mock execution. A prison guard came to her cell around midnight, blindfolded her, and told her, "[w]e are not getting anywhere with you. We will deal with you differently now." *Id.* ¶ 33. She was taken to a car and

driven outside the prison, where she was forced to stand up against a wall.  *Id.*  At that moment,

one of her interrogators told her the government had no tolerance for "spies" like her, that she was

an embarrassment as an Iranian and Muslim woman, and that she had been sentenced to die.  *Id.*

The interrogator said, "I told you to cooperate. Do you have anything to say?"  *Id.* ¶ 34.  Plaintiff

was terrified and could not stop crying.  She then heard men recite verses from the Qur'an that

are typically recited to the dying.  *Id.* She heard instructions being given to a firing squad to fire,

after which she heard several gun shots.  *Id.*  The last thought she had was: "I am going to die and

no one will know."  *Id.*  Her life flashing before her eyes, she lost consciousness and collapsed.

*Id.*

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████  ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

    Plaintiff remained at the hospital for several days.  *Id.*  ¶ 36. Her captors did not allow her

to have any visitors, and the hospital staff was forbidden to speak with her.  *Id.*  The interrogator

who had declared her death sentence again threatened her, saying "[w]e gave you another chance

to live; this is your last chance. Think it through and cooperate with us.  If you don't, next time

you are going to die."  *Id.*

During the tenth week of Plaintiff's detention, she was subjected to a second mock execution. *Id*. ¶ 44. A woman came to Plaintiff's cell late at night to teach her how to pray and to recite verses from the Qur'an. *Id*. The woman told Plaintiff that she only had a few hours left before the guards would come take her away, and that she should pray for forgiveness. *Id*. Eventually, the guards arrived, blindfolded her, forced her into a car, and drove her to a location where she was made to stand up against a wall. *Id*. ¶ 45. Plaintiff was told by her interrogator that she would be killed if she did not confess. *Id*. She became frozen with grief and fear. Plaintiff heard verses being recited from the Qur'an, followed by several gun shots. *Id*. Plaintiff again lost consciousness, and woke up in the hospital.

Throughout her detention, Plaintiff's captors also repeatedly subjected her to psychological abuse. Nearly every night for one month, she was forced by her interrogators to write out her life story. *Id*. ¶ 39. She produced lengthy written documents, only to have her interrogators tear up the statement and order her to start again. *Id.* At one point, an interrogator accused her of wasting his time and threatened to take her to the women's public jail or to a prison on the border of Iran and Afghanistan. *Id.* He told her that the female prisoners who are imprisoned there do not come back. *Id.* He said she would be raped, tortured, and never be seen again. *Id.*

During another interrogation, an interrogator informed Plaintiff that her fiancé had been arrested, was being held at the prison, and that he had told them "everything." *Id*. ¶ 27. Plaintiff was told that if she did not do the same, her fiancé would be subjected to the same treatment she was experiencing. *Id*. Plaintiff was heartbroken and feared for her fiancé's safety—it tormented her knowing he was being punished just for knowing her. *Id.* The guards then took Plaintiff past a room where officials were, in fact, holding her fiancé. *Id*. ¶ 28. She shouted, asking the guards why they had brought him to Evin Prison, at which point her fiancé saw her, and he too began

shouting.  *Id.*  Plaintiff overheard the guards tell her fiancé that she would be stoned to death unless he confessed.  *Id.*

Prison officials also tormented Plaintiff by promising her the opportunity to contact her family, only to renege at the last minute.  *Id.* ¶ 29.  For example, on one occasion a guard blind-folded her and took her to an area of the prison where she could hear prisoners talking to their families, and she could tell that she was in line to use the only telephone available to inmates.  *Id.*  When it was her turn, the guard pushed her forward, but as soon as she picked up the handset, she heard her interrogator on the other end of the telephone screaming that personal calls had not been authorized for her and that she should be returned to her cell.  *Id.*  She was never permitted to speak to her family.  *Id.* ¶ 30.

Prison officials also falsely told Plaintiff that her mother had died upon hearing news that Plaintiff had been executed.  *Id.* ¶ 37.  Plaintiff states that, in this moment, she "lost all hope. [She] was sure God had forgotten [her], perhaps for something [she] had done. . . [She] lost all will to live."  *Id.*

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████.

Plaintiff had been collecting the "truth pills" the guards had been giving her.  *Id.* ¶ 42. While initially the guards stood over her to ensure she took the pills, as time went on they simply handed them to her and walked away.  *Id.*  Plaintiff began hiding the pills under the carpet of her

cell. *Id.* ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

On Plaintiff's twelfth week of incarceration, the guards told her that they would release her, but only on the condition that Plaintiff's family paid collateral to ensure she did not leave the country. *Id.* ¶ 46.  A family friend then agreed to sign over the deed to her house to secure Plaintiff's release. *Id.*  Even then, she remained detained. *Id.*  To protest her continued detention, Plaintiff staged a hunger strike. *Id.*  She lasted a week before prison officials took her to the infirmary and began an intravenous drip of sugar water. *Id.*

### D.    Plaintiff's Release from Evin Prison

On September 2, 2012, Plaintiff's interrogators dictated a confession, which Plaintiff wrote and signed because she "could no longer tolerate the torture of being held in Evin Prison." *Id.* ¶ 47.  In it, Plaintiff falsely confessed to being a CIA agent and to engaging in activities against Iran. *Id.*  Afterwards, Plaintiff was returned her clothes and taken back to the infirmary where she was examined and weighed by a doctor. *Id.* ¶ 48.  During her four months in Evin Prison, she had lost twenty-five pounds. *Id.*

Plaintiff was then blindfolded and driven to a location where her mother and brother were waiting for her. *Id.* ¶ 49.   She could not stop crying when she saw them. *Id.*  As a condition of her release, she was placed under house arrest for two months until her next court date. *Id.* ¶ 50. Officials told her that they had sufficient evidence to send Plaintiff to prison for 12 years. *Id.*

Plaintiff spent the days after her release secluded in a room in her mother's home. *Id.* ¶ 51; [Dkt. 12-3, ¶¶ 21–22].  While she wanted to reconnect with people, she was physically and

emotionally incapable of doing so. Voices were terrifying to her, as were lights, noises, and the sounds of everyday life. [Dkt. 12-2, ¶ 50; Dkt. 12-3, ¶¶ 23–24].

A few weeks after her release, Plaintiff was walking home from a meeting with her attorney when a car drove onto the sidewalk and hit Plaintiff, fracturing her pelvis. [Dkt. 12-2, ¶ 52]. Her injuries required a week's stay in the hospital. *Id*. Plaintiff alleges that when she met with the prosecutor, he implied he knew of, or was involved in, the vehicular attack, stating, in a dry, sarcastic tone, "I told you to stay home. You don't know the city, and it can be very dangerous." *Id*.

Plaintiff remained terrified that she could be detained again at any time. A few months later, officials forcibly took Plaintiff from her mother's house in a blindfold to an unknown location, where she was interrogated about the identity of people in photographs that were showed to her. *Id*. ¶ 53. Plaintiff did not know any of the individuals pictured, and she was eventually returned to her house. *Id*.

In the months after her release, Plaintiff sought to reunite with her fiancé. *Id*. ¶ 54. However, they broke up. Accordingly to Plaintiff, "too much had happened" and a "specter . . . loom[ed]" over them that she would be rearrested and that she posed a threat to her fiancé and his family. *Id*. Plaintiff still mourns the loss of the relationship and of the life they had planned together. *Id.*

For many months thereafter, Iranian authorities denied Plaintiff the recovery of her passport. *Id*. ¶¶ 55–57. Each time she went to the prosecutor's office, he told her that her investigation was ongoing and that her passport could not be released. *Id.* ¶ 55. The thought of not being able to leave Iran filled Plaintiff with dread. *Id.* ¶ 56. Anytime her request for her passport went unanswered, she spiraled into a deeper depression. *Id.* Plaintiff became desperate to leave the

country. She engaged an attorney to assist her and repeatedly visited the judiciary, and followed up with the prosecutor whenever possible. *Id*. ¶ 56.

Finally, in April 2013, Plaintiff went to the passport office to obtain an update on her case, and a clerk informed her that she could pick up her passport the following week. *Id*. ¶ 57. The next week, she went to the passport office as instructed, and, to her surprise, was able to obtain her passport. *Id*. In May 2013—nearly eight months after her release from Evin Prison—Plaintiff traveled to Tabriz, Iran, where she caught a flight to Tbilisi, Georgia. *Id*. ¶ 58. She stayed up all night in Tabriz, fearing the guards would come to detain her again. *Id*. In Tbilisi, she acquired a new U.S. passport, after which she flew to Dubai. *Id*. ¶¶ 59–60.

### E. Life After Evin Prison



In Dubai, Plaintiff noticed immediately that Plaintiff was a changed person and that she looked weary and frightened. *Id.* ¶ 13. Plaintiff told she could not bear to be in public places and asked immediately to go home. *Id.* For the next two weeks, she stayed at home in Dubai. *Id.* ¶¶ 13, 22.

During that time, reports that Plaintiff was despondent. *Id.* ¶ 17. Plaintiff spent her first night with crying and screaming; was unable to calm her. *Id.* ¶ 16. Plaintiff no longer wanted to see friends—a stark change from the "quick-witted, free-spirited woman" had known before. *Id.* ¶ 21.

Plaintiff remained in Dubai until August 2013 to settle her affairs with HeavyLift. [Dkt. 12-2, ¶ 60]. Upon her return to Dubai, Plaintiff learned that HeavyLift was ceasing operation. *Id*. ¶ 68. Plaintiff was offered a position with HeavyLift's parent company, ALG Transportation, Inc. ("ALG Transportation"), as Vice President of Marketing. *Id*. This position required her to re-locate to Kansas City. *Id*. Accepting the position, Plaintiff worked for ALG Transportation in Kansas City until May 2017. *Id*. ¶ 60, 68. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████.

**F.      The Impact of Plaintiff's Arrest and Detention**

It has now been over four years since Plaintiff returned to the United States. ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████   ████████████   ██████████████████████

████████████████████████████████████████████

████

████████████████████████████████████████

████████████████████████████████████████████-

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



## IV.    CONCLUSIONS OF LAW

A default judgment may be entered against a foreign sovereign when (1) subject matter jurisdiction over the claims is established; (2) personal jurisdiction is properly exercised over the defendants; (3) the plaintiff has satisfactorily presented evidence establishing the defendants' liability to the plaintiff; and (4) the plaintiff has satisfactorily proven they are entitled to the monetary damages the plaintiff seeks.  *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017).  Each of these requirements for entry of default judgment will be addressed in turn below.

### A. Subject Matter Jurisdiction

Section 1330(a) of Title 28 grants this Court original subject matter jurisdiction "without regard to amount in controversy" over (1) nonjury civil actions (2) as to any claim for relief *in personam* (3) against a foreign state (4) provided that the foreign state is not entitled to immunity under sections 1605–1607 of the FSIA. *See* 28 U.S.C. § 1330(a); *see also Reed*, 845 F. Supp. 2d at 210; *Braun*, 228 F. Supp. 3d at 75.

The first three prerequisites have plainly been met here. First, Plaintiff has brought a nonjury civil action. [Dkt. 1-1 at 2]. Second, this is an action seeking relief *in personam*, rather than *in rem*. Third, Defendant the Government of the Islamic Republic of Iran is a foreign sovereign. *See Braun*, 228 F. Supp. 3d at 75 & n.3. With respect to Defendant the Revolutionary Guard, this Court has held multiple times that it is a political subdivision of Iran and may be treated as the foreign state itself for the purposes of an action under the state sponsored terrorism exception to the FSIA. *See Ben-Rafael*, 718 F. Supp. 2d at 31–32 (collecting cases); *see also infra* note 6.

The fourth requirement for subject matter jurisdiction—that Defendants are not entitled to foreign sovereign immunity under the FSIA—requires some further discussion. Plaintiff asserts this Court's jurisdiction lies because Defendants subjected her to torture falling within the FSIA's "terrorism exception" to the sovereign immunity otherwise granted to foreign states. 28 U.S.C. § 1605A. That exception provides, in pertinent part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture . . . if such act . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

20

28 U.S.C. § 1605A(a)(1). A victim seeking relief under this exception must prove that (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred," § 1605A(a)(2)(A)(i)(I); (2) "the claimant or the victim was, at the time the act . . . occurred a national of the United States," § 1605A(a)(2)(A)(ii)(I); (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration," § 1605A(a)(2)(A)(iii); and (4) an official, employee, or agent of the foreign state, while acting within the scope of his or her office, employment, or agency, (5) engaged in an act of torture that caused personal injury or death, § 1605A(a)(1); *see also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015). Each of these elements has been satisfied here.

First, Iran was designated a state sponsor of terrorism on January 19, 1984, and has remained so designated since that date, including in 2012 during Plaintiff's detention in Evin Prison. *See* U.S. Dep't of State, State Sponsors of Terrorism, *available at* https://www.state.gov/j/ct/list/c14151.htm (last visited Jan. 4, 2018). And, as found previously, the Revolutionary Guard is fairly treated as part of the Iranian government under the FSIA. *Ben-Rafael*, 718 F. Supp. 2d at 32; *see also infra* note 6. Second, Plaintiff obtained U.S. citizenship in October 2004 and was a national of the United States throughout her 2012 detention. [Dkt. 12-2, ¶ 3 & 29]. Third, Plaintiff included an offer of arbitration with the documents served on Iran on January 17, 2017. [Dkt. 5-1 at 2]. Defendants did not respond to that offer. Nothing more is necessary to satisfy the requirement of affording the foreign state a reasonable opportunity to arbitrate the claim. *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir.

2003) ("a reasonable opportunity to arbitrate" need not precede the filing of the complaint); *see also Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 158 (D.D.C. 2017).

With regards to the final two elements, Plaintiff must prove that an official, employee, or agent of the foreign state, while acting within the scope of his or her office, employment, or agency, engaged in an act of torture that caused personal injury or death to the plaintiff. 28 U.S.C. § 1605A(a)(1). "Torture" is defined for purposes of the FSIA as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual." 106 Stat. 73, note following 28 U.S.C. § 1350; 28 U.S.C. § 1605A(h)(7). "Mental pain or suffering" is further defined as prolonged mental harm caused by or resulting from—

> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>
> (C) the threat of imminent death; or
>
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

*Id.*

In *Price v. Socialist People's Libyan Arab Jamahiriya*, the D.C. Circuit gave extensive consideration to what conduct should be deemed "torture" under the FSIA. 294 F.3d 82, 92–93 (D.C. Cir. 2002) ("*Price I*"). The Court of Appeals determined that whether an act satisfied the statutory definition of torture required assessing two components: (1) the severity of the pain and suffering intended and actually inflicted on the victim, and (2) the purposes for which such pain and suffering were administered. *Id.* As to the severity component, *Price I* instructed that the

conduct at issue must be "sufficiently extreme and outrageous to warrant . . . universal condemnation," and that "[t]he more intense, lasting, or heinous the agony, the more likely it is to be torture." *Id.* However, "torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault." *Id.* at 93. As the Circuit warned, "not *every* instance of excessive force used against prisoners[] is torture under the FSIA." *Id.* (emphasis in original). Rather, torture "is a label that is 'usually reserved for extreme, deliberate and unusually cruel practices,'" such as, "sustained, systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." *Id.* at 93–94 (quoting S. EXEC. REP. No. 101-30, at 14 (1990)); *see also Simpson*, 326 F.3d at 234 (holding that allegations that plaintiff was "interrogated and then held incommunicado," "threatened with death . . . if [she] moved from the quarters where she was held," and "forcibly separated from her husband," although reflecting a bent toward cruelty, did not rise to the level of torture). With respect to the purposes for which such pain and suffering is inflicted on the victim, *Price I* makes clear that "torture can occur under the FSIA only when the production of pain is purposive, and not merely haphazard." 294 F.3d at 93. To constitute torture, therefore, the conduct at issue must be "both intentional and malicious." *Id.*; *see also Han Kim*, 774 F.3d at 1050 ("[S]uffering alone is insufficient to establish a claim under the FSIA's terrorism exception. To qualify as torture, the mistreatment must be purposeful—that is, the defendant must have targeted the victim . . . .").

Here, Plaintiff was subject to injurious physical pain and suffering at Evin Prison that qualifies as torture under the FSIA. For most of her detention, Plaintiff was confined to a small cell lacking adequate light and toilet facilities, and was left with nothing on which to sleep except an insect-infested rug. [Dkt. 12-2, ¶ 23]. She received inadequate medical care. *Id.* ¶ 26. She was

forced to take mood-altering drugs each day of her confinement and, for the first six weeks, endured lengthy interrogations every day. *Id.* ¶ 16, 24. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

Plaintiff's captors also inflicted on her extreme mental pain and suffering that qualified as torture under the FSIA. She was subject to two mock executions, both of which caused her to believe that she was about to die. *Id.* ¶¶ 33–34; 44–45. The mental distress caused by the mock firing squads was so acute that Plaintiff lost consciousness on both occasions. *Id.* ¶¶ 34, 45.

████████████████████████████████████████████

Defendants also threatened to transfer Plaintiff to another prison where she would be raped, treated to further abuse, and never released. *Id.* ¶ 39. They falsely reported to Plaintiff that her mother had died when she was told of Plaintiff's execution—a revelation that caused Plaintiff to lose "all will to live." *Id.* ¶ 37. Plaintiff feared for the safety of her fiancé, whom she had seen being interrogated in the prison. *Id.* ¶¶ 27–28. She was told by her captors that he would suffer the same abuse that she was experiencing if she did not tell them what they wanted to know. *Id.* She also heard her captors threatening her fiancé that she would be stoned to death unless he confessed, leaving her "heartbroken . . . [and] tormented . . . that he was being punished just for knowing [her]." *Id.* ¶¶ 27–28.

The undersigned finds that the physical and mental pain and suffering inflicted upon Plaintiff by her captors, together, are more than sufficient to satisfy the severity requirement for torture under the FSIA as prescribed in *Price I*. This conclusion is consistent with this Court's case law that has consistently determined that victims treated similarly to Plaintiff were victims

of torture under the FSIA. In *Hekmati*, for example, this Court concluded that a plaintiff experienced torture where he was beaten with batons, struck with an electric taser, whipped with cables, forced to maintain painful standing positions, deprived of adequate food, toilet facilities, and medical care, and forced to endure unsanitary conditions of confinement. 278 F. Supp. 3d at 150–54; *see also Kilburn*, 699 F. Supp. 2d at 152 (concluding victims experienced torture in the form of "beatings, unsanitary conditions, inadequate food and medical care, and mock executions"); *Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416, 425 (D.D.C. 2007) (concluding that "striking [plaintiff] repeatedly on the soles of his feet with an electrical cable, hanging [him] upside down from the ceiling during an interrogation session, and assaulting [him] with a coke bottle prior to his departure from Iran" were acts of torture); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 97 (D.D.C. 2003), *abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004) (victim was tortured when his captors regularly beat him, threatened him with death, and confined him in "deplorable and inhumane conditions"); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 32 (D.D.C. 2001), *aff'd sub nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) ("With respect to torture, the Court finds that the deprivation of adequate food, light, toilet facilities, and medical care for 564 days amounts to torture within the meaning of section 1605(a)(7).").[5] Plaintiff's treatment at Evin Prison, which

---

[5] Similar conduct by state sponsors of terrorism other than Iran have also been found to constitute torture by this Court. *See, e.g., Massie v. Gov't of the Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 66 (D.D.C. 2008) (finding that plaintiffs were victims of torture where they were "provided inadequate rations of food and forced to live in unsanitary conditions" and subjected to "individual threats of death, threats to kill others, [and] severe beatings" in order to coerce them into signing confessions); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 25 (D.D.C. 2001) (victim experienced torture as defined by the FSIA where he was threatened with physical injury if he did not confess to espionage, and incarcerated "in a room with no bed, window, light, electricity, water, toilet or adequate access to sanitary facilities").

included beatings and other physical abuse, lengthy interrogations, death threats, and mock executions, among other indignities, was similarly physically and mentally agonizing as the treatment described in these cases.

Defendants' infliction of severe physical and mental pain and suffering on Plaintiff was also intentional and malicious, thus satisfying the second criteria for torture under the FSIA proscribed in *Price I.* 294 F.3d at 93. Plaintiff's abuse while at Evin Prison was not "merely haphazard," *id.*, but was deliberate and purposeful. Its goal was to extract a false confession that she was working for the CIA and to gather information from her about U.S. activities abroad that her interrogators believed she possessed. [Dkt. 12-2, ¶¶ 18, 22]. Indeed, Plaintiff was not released until she falsely confessed to being a CIA agent and to engaging in activities against Iran on behalf of the U.S. government. *Id.* ¶ 47.

Finally, the undersigned finds that Plaintiff's captors and interrogators were acting on Defendants' behalf, and within the scope of their employment, thus satisfying the final requirement to establish this Court's subject matter jurisdiction under section 1605A(1) of the FSIA. *See* 28 U.S.C. § 1605A(1). Plaintiff was detained by agents of the Revolutionary Guard. [Dkt. 12-2, ¶ 10]. She was brought to Evin Prison, which is operated by the Iranian government and its agencies, including the Revolutionary Guard. [Dkt. 12-2, ¶ 13; Dkt. 13-5, ¶¶ 17–19]. Her cell was in a ward of the prison under the control of the Revolutionary Guard. [Dkt. 12-2, ¶ 15; Dkt. 13-5, ¶ 19]. According to Plaintiff's expert, Dr. Hadi Ghaemi, Defendant the Islamic Republic of Iran, and its security and intelligence agencies, including the Revolutionary Guard, have a policy and practice of arresting and detaining certain dual United States-Iranian nationals and falsely accusing them of espionage, as was done to Plaintiff here. [Dkt. 13-5, ¶ 32]. His expert report identifies at least nine instances in the last decade in which United States-Iranian nationals like Plaintiff

have been detained by the Iranian government and its agents and falsely accused of espionage. *Id.* ¶ 33. Plaintiff's treatment while detained at Evin Prison, including the mechanisms of suffering she was subjected to—lengthy interrogations, beatings, death threats, detention of loved ones, falsely reporting the death of a close relative, mock executions, and extraction of a forced confession—is remarkably consistent with the treatment of other United States-Iranian nationals detained at the facility. [Dkt. 13-5, ¶¶ 3, 9, 17, 20, 22–33, 39; Dkt. 13-12, ¶¶ 9–14, 26]. For these reasons, the undersigned credits Dr. Ghaemi's opinion that Plaintiff's detention and subsequent abuse while at Evin Prison "was at the direction of officials, employees, or agents of the Government of the Islamic Republic of Iran, acting within the scope of their office, employment or agency." [Dkt. 13-5, ¶ 17].

Accordingly, the undersigned recommends that this Court find that sovereign immunity poses no bar in this case, and that all of the conditions for assertion of its subject matter jurisdiction over Plaintiff's suit pursuant to section 1330(a) have been met.

### B. Personal Jurisdiction under the FSIA

Personal jurisdiction over a foreign sovereign is established in FSIA cases if (1) the court has subject matter jurisdiction under section 1330(a), and (2) service of process has been properly made pursuant to section 1608 of the Act. 28 U.S.C. § 1330(b); *see also Price I*, 294 F.3d at 89. As discussed above, the requirements for subject matter jurisdiction have been established in this case. With regard to service, section 1608(a)(1) through (a)(4) provides for service of process on a foreign state or political subdivision through one of four means listed in "descending order of preference."[6] *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).

---

[6] The FSIA's service of process requirements differ depending on whether the defendant is "a foreign state or political subdivision of a foreign state," *see* 28 U.S.C. § 1608(a), or "an agency or instrumentality of a foreign state," *see* 28 U.S.C. § 1608(b). Plaintiff's decision to effect service pursuant to section 1608(a) was plainly correct for Defendant the Government of the Islamic Republic of Iran. The question arises, however, as to how the Revolutionary Guard

Plaintiffs are instructed to first attempt service through "any special arrangement for service" that may exist between the plaintiff and the foreign sovereign, 28 U.S.C. § 1608(a)(1); then through delivery in accordance with any "applicable international convention on service of judicial documents," *id.* at § 1608(a)(2); then through mail addressed to the head of the ministry of foreign affairs of the foreign state, *id.* at § 1608(a)(3); and finally through diplomatic channels with the assistance of the U.S. Department of State, *id.* at § 1608(a)(4).

No special arrangements for service exist between Iran and the Plaintiff, nor is Iran a party to any applicable international convention on the service of judicial documents. The first two methods of service are therefore inapplicable. *See Haim v. Islamic Republic of Iran*, 902 F. Supp. 2d 71, 73 (D.D.C. 2012); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 70 (D.D.C. 2010). However, instead of proceeding to effectuate service through mail pursuant to section 1608(a)(3), Plaintiff first attempted service only through diplomatic channels pursuant to section 1608(a)(4).

---

should be categorized under the FSIA. In *Transaero, Inc. v. La Fuerza Aerea Boliviana*, the D.C. Circuit adopted a categorical approach to determine whether an entity should be considered an agent or instrumentality of a foreign state, or as a part of the foreign state itself. 30 F.3d 148 (D.C. Cir. 1994). If the core functions of the entity are governmental, then the entity is considered a political subdivision of the foreign state and treated as part of the foreign state itself. *Id.* at 153. If an entity's core functions are commercial, it is considered an agent or instrumentality of the foreign state for purposes of service of process. *Id.*; *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234–35 (D.C. Cir. 2003), *superseded by statute on other grounds*.

The Revolutionary Guard is properly treated as part of the Islamic Republic of Iran for purposes of the FSIA's service of process provisions. It is a branch of Iran's armed forces, and is responsible for internal border security. [Dkt. 12-1 at 11]. Specifically, it is made up of naval, air, and ground components with roughly 150,000 fighters. Greg Bruno *et al.*, *Iran's Revolutionary Guards*, COUNCIL ON FOREIGN RELATIONS (June 14, 2013), https://www.cfr.org/backgrounder/irans-revolutionary-guards. "A nation's armed forces are clearly on the governmental side" of the *Transaero* divide. *Roeder*, 333 F.3d at 234; *see also Transaero*, 30 F.3d at 153; *S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 108 (D.D.C. 2012) (reviewing cases applying the *Transaero* test and finding "any nation's armed forces . . . to be the state itself or a political subdivision of the state, rather than an agency or instrumentality" thereof). The conclusion that the Revolutionary Guard is a political subdivision of the Iranian government, and not an agency or instrumentality thereof is in accord with the findings of other judges of this Court. *See, e.g.*, *Ben-Rafael*, 718 F. Supp. 2d at 32 (Huvelle, J.); *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 199 (D.D.C. 2008) (Lamberth, J.); *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 32 (D.D.C. 2005) (Kollar–Kotelly, J.); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 117 (D.D.C. 2005) (Bates, J.). Thus, Plaintiff's service of process on the Revolutionary Guard pursuant to section 1608(a) of the FSIA was appropriate.

Citing this Court's *Attorney Manual for Service of Process on a Foreign Defendant*, Plaintiff asserts that, "insofar as Defendants are affiliated with the Government of Iran, Plaintiff need not attempt service under other provisions of § 1608 prior to requesting service [via diplomatic channels] under § 1608(a)(4)." [Dkt. 5-1]. Indeed, when the instant complaint was filed, the *Attorney Manual* on the Court's website[7] stated: "The countries of Iran and Iraq have not objected to service by mail. However, many attempts at service by mail or courier are unsuccessful. Therefore, it is okay for an attorney to request service directly through diplomatic channels (28 U.S.C. § 1608(a)(4)) without attempting service under any other provisions first." [Dkt. 20-1 at 8].

Yet, recent decisions from this Court have held that service on Iran may not be perfected solely via diplomatic channels pursuant to section 1608(a)(4), and have rejected any interpretation of the *Attorney Manual* that might be read to permit otherwise. In *Relvas v. Islamic Republic of Iran*, for example, Judge Royce C. Lamberth explained that the *Attorney Manual* "only speak[s] of [mail service pursuant to] § 1608(a)(3) as a bureaucratic prerequisite to *requesting* service through diplomatic means from the Clerk's Office and State Department," and held that the "exclusive manner to demonstrate that service cannot be effected within thirty days [by mail] under § 1608(a)(3) is to attempt such service." No. 14–cv–01752–RCL (D.D.C. Feb. 18, 2016) (Mem. & Order) at 2–3, ECF No. [32]; *see also Estate of Hirshfeld v. Islamic Republic of Iran*, 235 F. Supp. 3d 45, 47 (D.D.C. 2017) ("The statute provides that service pursuant to § 1608(a)(4) is permissible only if service cannot be made within 30 days [by mail] under subsection (a)(3)."); *Karcher v. Islamic Republic of Iran*, 249 F. Supp. 3d 557, 559 (D.D.C. 2017) (holding service was perfected after plaintiffs complied with a court order to "make diligent efforts to serve Defendant" and effected service under § 1608(a)(3) after effecting service under § 1608(a)(4)).

---

[7] The *Attorney Manual* has since been removed from the Court's website.

Citing this caselaw, the undersigned ordered Plaintiff to show cause on April 23, 2018 as to why her motion for default should not be denied for failure of service on the Defendants. [Dkt. 17]. Plaintiff responded that service via diplomatic channels is all that is required because, as recognized in the *Attorney Manual*, the Government of Iran has repeatedly refused to accept service by mail when sued previously in this Court. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 70; *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 11 (D.D.C. 2009); *Ben-Rafael*, 540 F. Supp. 2d at 52.[8] In the alternative, following the issuance of the show cause order, Plaintiff also sought to perfect service by mail on the Defendants pursuant to section 1608(a)(3). As required by that section, she requested that the Clerk of Court mail to the Iranian Ministry of Foreign Affairs a translated copy of the summons, complaint, and notice of suit. [Dkt. 21; Dkt. 22]. The Clerk of Court issued a Certificate of Mailing on May 8, 2018, including a copy of the DHL waybills and tracking numbers for each package. [Dkt. 23-1]. On May 20, 2018, the Iranian Ministry of Foreign Affairs refused delivery of each package. [Dkt. 25]. Given that refusal, as this Court has held in other cases, further attempts at service by mail pursuant to section 1608(a)(3) would be futile. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 70 (service under section 1608(a)(3) was "to no avail; service was refused"); *Ben-Rafael*, 540 F. Supp. 2d at 52 (D.D.C. 2008) (noting service under 1608(a)(3) was "not possible" because plaintiffs "attempted service on August 18, 2006, under § 1608(a)(3), but the recipients refused delivery on August 26, 2006, and the package was returned").

Mail service under section 1608(a)(3) having failed, in the typical case a plaintiff would then attempt service via the next method of service listed in section 1608(a), i.e., via diplomatic

---

[8] In several recent cases, however, it appears that the Government of Iran has accepted service by mail, belying Plaintiff's argument. *See, e.g.*, *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, No. 16-CV-01436 (APM), 2018 WL 2023498, at *5 (D.D.C. May 1, 2018) (service perfected on Iran by mail pursuant to section 1608(a)(3)); *Karcher*, 249 F. Supp. 3d at 559–60 (delivery to Ministry of Foreign Affairs by DHL treated as effective under section 1608(a)(3) where package was signed for).

channels pursuant to section 1608(a)(4). Of course, Plaintiff here served both Defendants via dip-lomatic channels in January 2017, an effort that generated no response from either Defendant and caused the Clerk of the Court to enter default. [Dkt. 8; Dkt. 10; Dkt. 11]. Plaintiff argues that requiring her now to re-serve Defendants through diplomatic channels would only cause further delay that would not protect any interest of Defendants and would be prejudicial to her. [Dkt. 20 at 14–15]. Plaintiff represents that she will seek to satisfy any judgment entered in this matter by filing a claim for recovery from the U.S. Victims of State Sponsored Terrorism Fund. [Dkt. 20 at 15]. The claim deadline is September 14, 2018, just over three months from now. *Id.* Requiring Plaintiff to serve Defendants again via diplomatic channels so as to ensure that the methods of service of process employed in this case are conducted in the order laid out in section 1608(a) would in all likelihood result in Plaintiff missing that deadline, thereby denying her the most real-istic path for recovery on any judgment. Indeed, through no fault of Plaintiff, it took more than five months to complete service via diplomatic channels on the Defendants when it was accom-plished the first time in 2017. [Dkt. 20 at 2–3; Dkt. 5; Dkt. 6; Dkt. 8 at 3, 8–9, 15].

The question then arises whether service of process on the Government of Iran may be deemed valid when a plaintiff accomplishes it in the reverse order of that outlined in section 1608(a), i.e., when service is accomplished via diplomatic channels under section 1608(a)(3) prior to attempting (and failing to achieve) service via mail under section 1608(a)(4). One judge in this District has so held. Relying on the D.C. Circuit's instruction that "[w]hen serving a foreign sov-ereign 'strict adherence to the terms of 1608(a) is required,'" this Court in *Estate of Hirshfeld*, deemed ineffective service on the Government of Iran where, as here, it was attempted in the reverse order outlined in section 1608(a). 235 F. Supp. 3d at 47 (quoting *Barot*, 785 F.3d at 27). Other judges from this District have not been so demanding. In *Agudas Chasidei Chabad of United*

*States v. Russian Federation*, 798 F. Supp. 2d 260, 268–69 (D.D.C. 2011), this Court excused defective mail service under section 1608(a)(3) because service was properly made via diplomatic channels under section 1608(a)(4).  And in two other recent cases the Court has upheld service on Iran when it was *only* attempted via diplomatic channels, albeit without any analysis of the issue. *See*, *e.g.*, *Hekmati*, 278 F. Supp. 3d at 156, 162; *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 100 (D.D.C. 2017) ("plaintiff properly made effective service through diplomatic channels"). Thus, the caselaw in this area is contradictory.

The undersigned recommends that Plaintiff's efforts at service to date be deemed sufficient under section 1608(a) for entry of a default judgment against Defendants.  Although *Barot* holds that "[w]hen serving a foreign sovereign, 'strict adherence to the terms of 1608(a) is required,'"  it also describes section 1608(a) as prescribing four methods of service "in descending order of *preference*," not obligation.  785 F.3d at 27 (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994)) (emphasis added).  Here, Plaintiff successfully served the summons and complaint on Defendants in January 2017 via diplomatic channels under section 1608(a)(4).  In the intervening eighteen months, Defendants have not appeared to defend this action.  Lest there be any doubt as to Defendants' intent in responding to service in this matter, one month ago the Iranian Ministry of Foreign Affairs refused Plaintiff's attempt at service by mail of the summons and complaint pursuant to section 1608(a)(3).  There is no reason to believe the outcome would be any different were Plaintiff to attempt to serve Defendants again now via diplomatic channels. No conceivable purpose—or interest of Defendants—would be served by requiring her go through that empty gesture just so as to preserve the "order of preference" of methods of service outlined in section 1608(a).  *Barot*, 785 F.3d at 27.  To so require in this case would be prejudicial to Plaintiff; indeed, it may be the difference between her receiving some portion of

any judgment entered in her favor and nothing at all.  This Court must also acknowledge the role it played in contributing to any infirmity in the order of methods of service Plaintiff pursued in this case.  Plaintiff did not attempt mail service eighteen months ago because she fairly read this Court's *Attorney Manual* as allowing her to forego that method of service.  Plaintiff has made good-faith efforts to effect service on Defendants in this matter and has succeeded in doing so via diplomatic channels pursuant to section 1608(a)(4).  She should not now be penalized—perhaps gravely so—because she reasonably relied on direction from this Court that nothing else was required when suing the Government of Iran.  The Circuit's decision in *Barot* is instructive on what consideration should be given these factors.  There, in reversing a dismissal of a complaint for failure to properly effectuate service on a defendant associated with a foreign sovereign, the Circuit noted "the district court's statutory responsibilities and prominent role in the mistakes of service in [plaintiff's] case, the prejudice to [plaintiff], the lack of prejudice to the [defendant] Embassy, and [plaintiff's] good-faith efforts at service."  785 F.3d at 29.  Here, each of those considerations weigh in favor of finding Plaintiff's service on Defendants sufficient under section 1608(a).  For all of these reasons, the undersigned recommends this Court find that it has personal jurisdiction under the FSIA over Defendants.

## C.     Defendants' Liability

Section 1605A(c) provides a federal private right of action against designated state sponsors of terrorism for enumerated categories of persons, including "national[s] of the United States" for "personal injury or death caused by . . . that foreign state . . . for which the courts of the United States may maintain jurisdiction . . . for money damages," including punitive damages.  28 U.S.C. § 1605A(c).  To effectuate this statutory private right of action, Plaintiff pleads causes of action under 28 U.S.C. §1605A(c) for assault and battery, false imprisonment, and intentional infliction

of emotional distress, [Dkt. 1, ¶¶ 61–81], for which she seeks compensatory and punitive damages. *Id.* But, although section 1605A "provides a private right of action, it provides no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages." *Braun*, 228 F. Supp. 3d at 78. Plaintiff consequently cites 28 U.S.C. § 1606, which states that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," to support her argument that state law—or, more accurately, the law of the District of Columbia—provides the rules of decision for her claims. *See, e.g.*, *Owens v. Republic of Sudan*, 864 F.3d 751, 809 (D.C. Cir. 2017) ("[Section] 1606 . . . requires [a court] to apply state law to suits under the FSIA."). However, the D.C. Circuit recently expounded in *Owens* that section 1606 does not apply to the private right of action arising out of section 1605A, in part due to the inherent conflict between the two sections: section 1605A expressly provides for punitive damages against a foreign state while section 1606 expressly forbids them. *See* 864 F.3d at 808. The Circuit outlined in *Owens* that, when Congress passed the state sponsor of terrorism exception to sovereign immunity in the 2008 National Defense Authorization Act ("NDAA"), it repealed the old section 1605(a)(7) and codified the current terrorism exception in a new section, designated 1605A. *Id.* at 765. The intent of Congress in creating an entirely new section was to avoid the inherent conflict resulting from section 1606's prohibition on punitive damages and section 1605A's provision for them. *Id.* at 808–09. As a result, section 1606 expressly applies only to sections 1605 and 1607, and not to section 1605A. *Id.* ("Avoiding a conflict between § 1605 and § 1606 . . . more likely explains the Congress's purpose in moving the terrorism exception out of § 1605.").

Thus, Plaintiff's attempt to utilize section 1606 to supply state law rules of decision to her action pursuant to section 1605A(c) must fail. Rather, where, as here, there is no obvious source

of substantive law under which to evaluate a defendant's liability, courts in this District have applied "general principles of tort law," such as those included in the Restatement (Second) of Torts.[9] *See, e.g.*, *Braun*, 228 F. Supp. at 78–82 (applying tort principles from the Restatement (Second) of Torts to an action brought pursuant to section 1605A); *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) ("[In determining liability under section 1605A], the Court must again consider the complicated question of what principles of law it should apply to these claims sounding in tort. On the one hand, because these actions arise solely from statutory rights, they are not in theory matters of 'federal common law.' Yet, because federal courts must evaluate the extent and nature of the claims in these actions, courts are forced, in practice, to apply general principles of tort law—an approach that in effect looks no different from

---

[9] Even were the undersigned to apply section 1606 to this dispute, the result would be the same. As the D.C. Circuit explained in *Oveissi v. Islamic Republic of Iran*, although the "FSIA does not contain an express choice-of-law provision," the statute provides, "that a foreign state stripped of its immunity 'shall be liable in the same manner and to the same extent as a private individual under like circumstances,'" 28 U.S.C. § 1606, thereby "ensur[ing] that, if a FSIA exception abrogates immunity, plaintiffs may bring state or foreign law claims that they could have brought if the defendant were a private individual." 573 F.3d 835, 841 (D.C. Cir. 2009) (quoting 28 U.S.C. § 1606).

Under a section 1606 choice-of-law analysis, United States law would apply over Iranian law in this case, as the United States "has a unique interest in its domestic law, rather than the law of a foreign nation, determining damages in a suit involving [a terrorist] attack," or here, torture of a U.S. national by agents of a foreign sovereign. *Dammarell v. Islamic Republic of Iran*, No. CIV.A. 01-2224JDB, 2005 WL 756090, at *20 (D.D.C. Mar. 29, 2005). Moreover, under District of Columbia choice-of-law rules, where a U.S. citizen plaintiff is not a U.S. domiciliary at the time of a terrorist attack, the law of the forum state will apply. *See Ben-Rafael*, 540 F. Supp. 2d at 54 ("For plaintiffs without a U.S. domicile . . . courts have determined that the forum state has the greatest interest."); *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 537 F. Supp. 2d 85, 96–97 (D.D.C. 2008). Here, Plaintiff was domiciled in the United Arab Emirates at the time of her detention, thus, the law of the District of Columbia would apply.

Application of the law of the District of Columbia, rather than that of the Restatement (Second) of Torts, would not materially alter the analysis as there is no meaningful difference between District of Columbia tort law and the Restatement (Second) of Torts with respect to Plaintiff's causes of action. *See, e.g.*, *Jackson v. D.C.*, 412 A.2d 948 (D.C. 1980) (adopting the definitions of assault and battery from the Restatement (Second) of Torts)); *Williams v. D.C.*, 9 A.3d 484, 493–94 (D.C. 2010) ("In order to establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show '(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" (quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003))); *Gabrou v. May Dep't Stores Co.*, 462 A.2d 1102, 1104 (D.C. 1983) ("In this jurisdiction, the gravamen of a suit for false arrest or false imprisonment is an unlawful detention."); *Shaw v. May Dep't Stores Co.*, 268 A.2d 607, 609 (noting there is no practical distinction between false arrest and false imprisonment in the District of Columbia); *see also* Standardized Jury Instructions for the District of Columbia, §§ 18.02 (False Arrest); 19.01 (Assault); 19.03 (Battery); 25.05 (Intentional Infliction of Emotional Distress) (2002).

one that explicitly applies federal common law.").  Indeed, the application of the Restatement (Second) of Torts to articulate the justification for a plaintiff's recovery has been common practice in this District since the 2008 NDAA was put into effect.  *See, e.g.*, *Roth*, 78 F. Supp. 3d at 399 ("[D]istrict courts in this jurisdiction 'rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions' to define the elements and scope of these theories of recovery." (quoting *Oveissi*, 768 F. Supp. 2d at 54)); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014) (same); *Rimkus*, 750 F. Supp. 2d. at 176 (same).  Consistent with this approach, the undersigned will evaluate below Plaintiff's claims of assault and battery, false imprisonment, and intentional infliction of emotional distress under the principles adopted by the Restatement (Second) of Torts.

### 1.     Assault

Defendants are liable for assault under the Restatement if their agents' acts were "intend[ed] to cause a harmful or offensive contact with . . . or an imminent apprehension of such contact" to Plaintiff and Plaintiff was "thereby put in such imminent apprehension."  Restatement (Second) of Torts, § 21(1) (1965).  As this Court has previously determined, "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Valore*, 700 F. Supp. 2d at 76.

Plaintiff was held for 114 days in Evin Prison where she lived in constant fear of being tortured, beaten, or killed.  She established that her interrogators did in fact physically beat and whip her, as well as conducted two mock executions.  *See Jenco*, 154 F. Supp. 2d at 34 (noting that mock executions have "long been regarded as an archetypal assault").  Defendants clearly

intended to cause harmful contact or to create imminent apprehension of such contact and did, in fact, cause such apprehension. Defendants are therefore liable for assault.

2.       Battery

According to the Restatement (Second) of Torts, a defendant has committed battery if its agent "acts intending to cause a harmful or offensive contact with [a] person," and a "harmful contact with the person . . . directly or indirectly results." Restatement (Second) of Torts, § 13 (1965). Harmful contact occurs where there is "any physical impairment of the condition of another's body, or physical pain or illness." *Id.* § 15.

While at Evin Prison, Plaintiff has established that she was intentionally pushed down a flight of stairs, whipped, and beaten. Accordingly, Plaintiff has demonstrated that Defendants are liable for battery against her.

3.       False Imprisonment

A party is liable for false imprisonment if its agents: (a) confine a person within boundaries fixed by the agents; (b) the agents' actions result, directly or indirectly, in confining the victim; and (c) the victim is aware of the confinement. Restatement (Second) of Torts § 35 (1965); *see also Jenco*, 154 F. Supp. 2d at 34; *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C. 2016). For nearly four months, Defendants confined Plaintiff against her will in a cell in Evin Prison. She was not permitted to leave Evin Prison until she falsely confessed. [Dkt. 12-2, ¶ 47]. Defendants are therefore liable for false imprisonment.

4.       Intentional Infliction of Emotional Distress

Defendants are also liable for intentional infliction of emotional distress if they, "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress to" Plaintiff. Restatement (Second) of Torts, § 46(1); *see also Roth*, 78 F. Supp. 3d at 400 (quoting

*Estate of Heiser*, 659 F. Supp. 2d at 26). As found previously, Defendants' treatment of Plaintiff constitutes torture and, therefore, meets the "extreme and outrageous" standard. *See, e.g.*, *Massie v. Govt. of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 76 (D.D.C 2008) (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).

Accordingly, Plaintiff has established the Defendants' liability under section 1605A(c), for the torts of assault, battery, false imprisonment, and intentional infliction of emotional distress. The only question that remains is the amount of damages to be awarded.

### D.     Damages

In creating a private right of action in section 1605A(c) for victims of state sponsored terrorism, Congress also provided that such foreign states are liable for money damages, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were reasonably certain (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages." *Roth*, 78 F. Supp. 3d at 402 (alteration in original) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005)); *accord Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 (D.D.C. 2015). In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injuries. *See Reed*, 845 F. Supp. 2d at 214; *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

Plaintiff has satisfactorily shown that the pain and suffering she experienced at Evin Prison, and thereafter, were reasonably certain to occur as a result of Defendants' conduct and were actually the intended consequences of that conduct. *See Hekmati*, 278 F. Supp. 3d at 163 ("Pain and

suffering, past and future, are obviously a reasonably certain consequence of torture.").  Defend-

ants' conduct was plainly designed to cause Plaintiff extreme physical and psychological pain.

[Dkt. 12-2, ¶ 31 (stating that one of the guards told Plaintiff he "enjoyed the sight of [her] suffer-

ing)]. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

Concluding that Plaintiff has proven that "the consequences of the foreign state's conduct

were reasonably certain . . . to occur," the undersigned next turns to determining whether Plaintiff

has proven that the amounts she seeks for pain and suffering, economic loss, and punitive damages,

are "reasonable estimates" of the damages she suffered.  *Roth*, 78 F. Supp. 3d at 402.

       1.       Detention Pain and Suffering

While the FSIA does not specify precisely how damages are to be calculated for the phys-

ical and mental pain and suffering endured by plaintiffs, a formula of awarding $10,000 per day

of captivity has evolved in this District as a general standard for cases of prolonged and abusive

unlawful detention brought under the FSIA. *See e.g.*, *Hekmati*, 278 F. Supp. 3d at 163–64 (award-

ing $16.02 million in pain and suffering damages for plaintiff's 1,602 days of imprisonment);

*Stansell*, 217 F. Supp. 3d at 346 ($19.67 million for 1,967 days held hostage); *Moradi*, 77 F. Supp.

3d at 70 ($1.68 million for 168 days of imprisonment); *Kilburn*, 699 F. Supp. 2d at 157 ($5.03

million for 503 days held hostage); *Massie*, 592 F. Supp. 2d at 77 ($3.35 million for 335 days of

imprisonment); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 51 (D.D.C. 2001)

($23.54 million for 2,354 days of captivity).

The undersigned sees no reason to depart downward in this case from the $10,000 per day formula given the similarity of Plaintiff's pain and suffering to that experienced by the victims in the above-cited cases. Here, the $10,000 per day formula results in pain and suffering damages calculation of $1,140,000 for Plaintiff's 114 days of captivity. Plaintiff, however, seeks an upward enhancement of the $10,000 per day formula in light of the torture she experienced and the frequency with which it was inflicted upon her. In total, she asks to be awarded $5 million for the 114 days she was detained. [Dkt. 12-1 at 46].

Looking to similarly-situated victims in prior state sponsored terrorism and torture cases, the undersigned believes that an upward adjustment to the $10,000 per day formula is appropriate in this case. *See Hekmati*, 278 F. Supp. 3d at 163 ("The primary consideration in these cases is to ensure that 'individuals with similar injuries receive similar awards.'" (quoting *Moradi*, 77 F. Supp. 3d at 70)). ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████.

Further, this Court has previously awarded an additional $1,000,000 in compensatory damages for the pain and suffering experienced by a plaintiff who, as a result of the defendant's actions, faced imminent death alone. *Kilburn*, 699 F. Supp. 2d at 157 ("[Plaintiff] is entitled to additional compensation in the amount of $1,000,000 for the portion of his life that he spent facing certain death alone."); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 269 (D.D.C. 2002) (awarding an extra $1,000,000 to compensate for Plaintiff spending the final moments of his life

facing certain death); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2nd 78, 89 (D.D.C. 2002) (awarding an extra $1,000,000 to victim's estate for the several minutes before and after victim was shot and before he died); *Eisenfield v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 8 (D.D.C. 2000) (awarding $1,000,000 each to two victims of suicide bombing who died quickly, but not immediately after explosion). Here, although Plaintiff survived her ordeal, she also spent hours twice facing her death alone as a result of the two mock executions. [Dkt. 12-2, ¶¶ 34, 44]. During the first, Plaintiff heard verses being chanted from the Qur'an that are normally spoken to someone who is about to die, and she heard her interrogator order the firing squad to fire. *Id.* ¶ 34. After hearing several gun shots, she thought "I am going to die and no one will know." *Id.* She lost consciousness, collapsed, and was taken to the hospital. While still in captivity, she claimed that she "could not escape the terrifying memory of [her] first mock execution." *Id.* ¶ 40. Before her second mock execution, Plaintiff was told she had only hours left to live and that she should pray for forgiveness before she was again taken and placed up against a wall to be shot. *Id.* ¶¶ 44–45. She was told she would be killed if she did not confess. *Id.* Again she heard the shots fired, lost consciousness and woke up in the hospital. *Id.*

In line with the above-cited cases, the undersigned therefore recommends awarding Plaintiff an additional $1,000,000 for each of the two mock executions to compensate her for the time she spent alone apprehending her imminent death. In total, the undersigned recommends awarding Plaintiff $4,140,000 to compensate her for the pain and suffering she experienced during her detention in Evin Prison.

### 2. Post-Detention Pain and Suffering

Plaintiff also seeks $11 million to compensate for her post-release pain and suffering based on this Court's prior awards to similarly-situated plaintiffs. [Dkt. 12-1 at 48]. In *Price v. Socialist*

*People's Libyan Arab Jamahiriya*, the Court recognized that the $10,000 per diem formula will not always adequately compensate plaintiffs for the future pain and suffering they are likely to endure as a result of their detention and torture. 384 F. Supp. 2d 120, 135 (D.D.C. 2005) ("*Price II*"). In such cases, the court will award a post-release amount that reflects the length and severity of the plaintiff's detention and torture, the extent of the plaintiff's lasting physical and mental injuries, and the estimated number of years that the plaintiff can be expected to suffer from these injuries. *See id.*; *see also Moradi*, 77 F. Supp. 3d at 70; *Stansell*, 217 F. Supp. 3d at 346.

As with the calculation of Plaintiff's damages for the pain and suffering she experienced while detained, it is difficult to determine a dollar amount to compensate her for the pain and suffering she suffered following her release from prison. But the amounts awarded in similar cases are instructive. In *Massie*, for instance, the plaintiff was awarded a lump sum amount of $13,400,000 for post-release pain and suffering following 335 days of captivity, in addition to the per diem amount for the period of captivity. 592 F. Supp. 2d at 77. Likewise, in *Hekmati*, a plaintiff held for 1,062 days was awarded an additional $10,000,000 above the per diem amount to compensate for his post-release pain and suffering. *Hekmati*, 278 F. Supp. 3d at 164.

Plaintiff's injuries are consistent with those at issue in *Massie*. In that case, the plaintiff— a crew member on board a U.S. Navy vessel—was taken hostage and tortured by the Democratic People's Republic of Korea for eleven months in 1968. *Massie*, 592 F. Supp. 2d at 69. As a result of being repeatedly kicked in the stomach, back, ankles, groin, and knees, Massie suffered permanent physical injuries such as herniated disks, tinnitus, and pain in the legs, arms, and back. *Id.* Like Plaintiff, during his eleven months of captivity, Massie lost a significant amount of weight (51 pounds) due to malnutrition. *Id.* Massie was also rendered impotent due to repeated kicks to the groin. His impotency contributed to a failed marriage, multiple failed relationships,

and was an ongoing source of humiliation.  *Id.* ███████████████████████

██████████████████████████████████████████  Also like Plaintiff, Massie

suffered from severe and permanent PTSD and from a short temper that he did not have before

his time in captivity.  *Id.*  However, as this Court recognized in *Hekmati*, the formula used to

calculate the $13,400,000 for post-release pain and suffering damages in *Massie* "ignore[d] two

factors that are directly relevant to determining the magnitude of a victim's likely post-release

pain and suffering: the victim's age at the time of release (the length of time he will be experienc-

ing pain and suffering) and the extent of the victim's long-term injuries (the level of pain and

suffering)." *Hekmati*, 278 F. Supp. 3d at 164.

The better analog for this case is *Hekmati*, where the plaintiff was also held in Evin Prison.

[Dkt. 16].  Like here, Hekmati endured months in a small, windowless cell with a cold floor

covered only with a thin carpet.  278 F. Supp. 3d at 151.  He was served little food and lost a

significant amount of weight.  *Id.*  He was interrogated every few days, the purpose of which was

to elicit a false confession that he worked as an agent for the CIA.  *Id.* at 152.  During the inter-

rogations, Hekmati was subject to physical and psychological abuse, including whippings and

being handcuffed in "stress positions."  *Id.* at 151.  After suffering multiple panic attacks he was

forced to take pills that acted as a sedative.  *Id.* at 152.  Prison officials also lied to him about a

family member being involved in a terrible car accident, but refused to let him access the phone.

*Id.* at 151.  Ultimately, he was tried for spying, found guilty, and sentenced to death, which

"haunted [him] day in and day out," and left him "hypervigilant [and] paranoid that [his] execu-

tioners were about to arrive."  *Id.* at 152–53.

Hekmati was also closer in age upon his release to Plaintiff than was Massie.  Hekmati

was 32 when he was released, Massie was 20.  *Id.* at 164; *Massie*, 592 F. Supp. 2d at 69. While

Plaintiff was approximately ten years older than Hekmati at the time of her release, her life expectancy differs by only five years from Hekmati's (i.e., 45 years remaining for Hekmati versus 40 for Plaintiff).  *Hekmati*, 278 F. Supp. 3d at 164; [Dkt. 12-9 at 5].  For all of these reasons, Hekmati's $10,000,000 award for post-release compensatory damages, which took into account his age and life expectancy, is the better starting point for Plaintiff's award than Massie's.  *See Hekmati*, 278 F. Supp. 3d at 163 ("The primary consideration in these cases is to ensure that 'individuals with similar injuries receive similar awards.'" (quoting *Moradi*, 77 F. Supp. 3d at 70)).  Pro-rating Hekmati's $10,000,000 award to account for Plaintiff's five-year shorter life expectancy results in an award of $8,888,889 for her post-release pain and suffering.  Combining that amount to the recommended $4,140,000 award for her detention pain and suffering, would bring Plaintiff's total award for pain and suffering damages to $13,028,889.  The undersigned recommends that she be awarded that amount to compensate her for the pain and suffering Defendants caused.

### 3.    Economic Damages

Section 1605A(c) of the FSIA expressly provides that foreign sovereign defendants can be liable for economic damages.  Plaintiff here seeks total economic damages in the amount of $7,356,612 to compensate for lost earnings and out-of-pocket expenses arising from her time in captivity.  [Dkt. 12-1 at 48–51].  In a case under the FSIA, "[t]he report of a forensic economist may provide a reasonable basis for determining the amount of economic damages."  *Reed*, 845 F. Supp. 2d at 214 (D.D.C. 2012).  In assessing the validity of the report, the undersigned is required to assess the reasonableness of the assumptions relied upon by the expert.  *Roth*, 78 F. Supp. 3d at 402.  Here, Plaintiff has submitted an economic loss report prepared by forensic economist Jerome Paige, Ph.D., and financial consultant Richard Lockley, M.B.A.  [Dkt. 12-9].  The report

includes economic damages due to Plaintiff's lost earnings, her ongoing medical treatment and legal fees, and a lost opportunity to sell a property investment, each of which will be evaluated below.

<em>a.    Lost Earnings</em>

With respect to Plaintiff's lost earnings, the report assesses three loss scenarios that are based on her "inability to work to the level of her pre-event capacity." [Dkt. 12-9 at 4]. Under Scenario 1, Plaintiff continues working for HeavyLift International Airlines at an annual salary of $150,000 until she retires at age 67. Under Scenarios 2 and 3, Plaintiff leaves HeavyLift at age 50 for a higher paying job commanding an annual salary of $275,000 in Scenario 2 and $350,000 in Scenario 3. *Id.* The report does not provide any direction as to which employment scenario would have been most likely for Plaintiff. It further assumes no future earnings for Plaintiff after her termination from ALG Transportation in May 2017. *Id.* at 11–13, Tables 2–4. Based on a Social Security retirement age of 67, it estimates the net present value[10] for Scenario 1 to be $3,020,603, for Scenario 2 to be $5,236,611, and for Scenario 3 to be $6,556,216. *Id.* Plaintiff seeks the highest estimate for her lost earnings award. [Dkt. 12-1 at 51].

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[10] The undersigned held a further hearing on June 7, 2018, concerning the interest rates and wage growth rates used by Dr. Paige in his net present value calculation found in Plaintiff's economic loss report. [Dkt. 12-9]. The undersigned is satisfied that the methodologies used by Dr. Paige in the report are sound and result in a net present value calculation which is conservative.

[REDACTED]

However, there is no definitive evidence in the record that Plaintiff is unable to continue to work at all, as the economic loss report assumes. At most, the record demonstrates she is unable to work in her chosen field. After her release, she returned to work for Heavylift's parent company, ALG Transportation, though she struggled to spend more than twenty hours per week in the office. [Dkt. 12-2, ¶¶ 66, 68]. [REDACTED]

[REDACTED] The undersigned held a hearing on June 7, 2018, to better understand Plaintiff's evidence regarding her ability to work. Following that hearing, Plaintiff filed a status report which maintained that she has continued to look for work over the past year, but has been unable to find either full- or part-time employment. [Dkt. 26 at 2]. However, the report provided no further evidence of Plaintiff's complete disability. Accordingly, the undersigned finds that Plaintiff has not met her burden regarding a complete inability to work in the future. In the event the Court found her still able to perform some level of work, Plaintiff

further proposed in her status report an offset amount of $2,000 a month, or $24,000 per year, which was approximately the amount of income she received in 2015–2017 prior to her being terminated from her position at ALG Transportation.[11]  *Id.* at 3.  The undersigned finds that this amount is a reasonable measure of her earnings capacity going forward, given that she had a history of earning that amount in the years after her release from Evin Prison, and given that she has provided no other evidence for this Court to consider as a fair and reasonable offset for her earnings capacity going forward.

As between the competing lost earnings scenarios presented in her economic loss report, the undersigned finds it more likely that, had she not been wrongfully imprisoned, Plaintiff would have pursued more lucrative job opportunities with other employers rather than remain at Heavy-Lift in a lower paying job throughout her career.  [Dkt. 12-9 at 6].  Indeed, Plaintiff's pre-detention professional ambition is plain from the record.  Prior to her incarceration, Ray Adams, the former Chief Financial Officer for HeavyLift, described her drive and ambition as a 12 on a scale of 1 to 10.  [Dkt. 12-4, ¶ 55].  According to Mr. Adams, Plaintiff was "such a hard worker and so devoted to her work that she quickly rose through the company to become the General Manager of Heavy-Lift."  [Dkt. 12-7, ¶ 8].  In fact, she was the first female to be appointed as a General Manager of an airline in the Middle East.  *Id.* ¶ 9.  Prior to her detention, she worked 15-hour days for Heavy-Lift, managing an office of more than 150 people, all of whom reported to her.  [Dkt. 12-2, ¶¶ 66, 70; Dkt. 12-7, ¶ 10].  She was described as an irreplaceable asset to HeavyLift because she was

---

[11] In addition to the approximately $24,000 in U.S. income that she received from 2015 to 2017, Plaintiff also received a housing allowance of $24,000 and a vehicle allowance of $12,000 in the form of foreign earnings.  [Dkt. 12-9 at 6; Dkt. 26 at 3].  The foreign allowances were benefits connected to Plaintiff's prior employment with HeavyLift and ALG Transportation, apparently tied to housing costs in Dubai, and to cover the expenses of a vehicle necessary to do her job. Because these benefits were specific to Plaintiff's role with her previous employer, and more in the nature of expense reimbursement than income, they should not be included in her salary offset amount going forward.

"eagle-eyed in her ability to identify a business venture and dogged in her pursuit of that venture." [Dkt. 12-7, ¶ 10].

Importantly, Plaintiff has provided evidence that she intended to move to a larger company, or own her own business, prior to her detention. [Dkt. 12-2, ¶¶ 66–67]. Her job at Heavy-Lift provided her with the networking opportunities necessary to advance her career as it required constant engagement with the business community. *Id.* ¶ 66. Prior to her detention, Plaintiff had, in fact, been offered a position as a General Manager for a cargo affiliate of a large commercial airline with a proposed salary of $22,000 per month, or $264,000 per year, which aligns with the $275,000 annual salary proposed in Scenario 2. *Id.* ¶ 67.

For all of these reasons, the undersigned finds that Scenario 2 is the most reasonable basis on which to calculate Plaintiff's award for lost earnings. Based on a Social Security retirement age of 67 and an annual salary earnings potential of $24,000 per year going forward, the net present value of Plaintiff's lost earnings under that scenario is $4,894,934. [Dkt. 26-1 at 3, Table 3]. Accordingly, the undersigned recommends this figure be used as her award for lost earnings.

### b.    *Medical and Legal Costs*

Plaintiff's economic loss report also includes amounts for her out-of-pocket costs for on-going medical treatment, medical bills already incurred, and legal costs that were incurred as a result of her captivity. With respect to on-going medical treatment, Plaintiff is receiving treatment from a Dr. Larry Nieters, a clinical psychologist, who recommends that she attend weekly psychotherapy sessions for the remainder of her life. [Dkt. 12-9 at 7]. The lifetime cost of this treatment is calculated at $267,013.[12] *Id.* at 4. Furthermore, the report also includes Plaintiff's

---

[12] The psychotherapy sessions cost $160 per hour, or $8,320 per year if attended once a week. [Dkt. 12-9 at 8]. Based on Plaintiff's life expectancy age of 84 years, the total lifetime cost for the psychotherapy sessions is $307,840. Applying a discount rate for each year the services would be provided, results in a net present value of $267,013 for the sessions. [Dkt. 12-9 at 14, Table 5].

medical bills in the amount of $3,676 for treatment she has already received. *Id.* at 7. Finally, during the time Plaintiff was held captive, she was unable to pay her mortgage and went into default. *Id.* at 8. To remedy this, Plaintiff was required to pay fines of $5,735 and a court filing fee of $5,375. *Id.*

The undersigned finds that each of these costs are the result of Defendants' conduct, are reasonably estimated, and were incurred, or will likely incur in the future. Accordingly, the undersigned recommends that $281,799 be included in Plaintiff's damage award to compensate her for these costs.

### c. *Lost Opportunity to Sell Investment*

Finally, Plaintiff's economic loss report details damages she asserts arose from a lost opportunity to sell a parcel of land in Dubai as a result of her captivity. *Id.* at 7. Plaintiff and two other individuals purchased the property for U.A.E. Dirham ("AED") 12,580,429 in October 2009, with each member owning one-third. [Dkt. 12-2 at 39]. According to the records submitted with the report, on May 5, 2012, Plaintiff and the two individuals received an offer to buy the property for AED 13,000,000 that had to be accepted or rejected within 30 days. *Id.* at 42 (offer letter describing terms to be accepted or rejected in 30 days)]. Plaintiff avers the group planned to accept the offer, but were stymied by her May 13, 2012, detention by Defendants. *Id.* ¶ 83. Lacking Plaintiff's signature on the sale documents, the purchase offer was rescinded. *Id.*

In September 2015, following Plaintiff's release, the group received and accepted another offer to purchase the property at a lower price of AED 7,390,710. *Id.* at 44 (title deed stating final sale price for the land)]. Plaintiff requests an award based on her share of the lost property value from the 2012 offer to the 2015 sale. Utilizing a base conversion rate of U.S. dollars to AED of 3.67289 (which has remained relatively constant since Plaintiff made her sale because the U.A.E.

pegs the Dirham to the U.S. dollar)[13] translates to a total opportunity loss of $1,527,319.75, of which Plaintiff's seeks her share of $508,597.48.  [Dkt. 12-9 at 7].

The record contains both the 2012 offer, [Dkt. 12-2 at 42], and the 2015 title deed stating the final price for the land sale, *id.* at 44.  However, Plaintiff provides no other proof—with the exception of her own affidavit—of the group's intent or plans to accept the offer in 2012 that fell through due to her detention.  *Id.* ¶ 83.  Most importantly, there is no proof whether the group marketed the property for sale after Plaintiff's release in 2012, or whether selling it during that period would have reduced the loss for which she now seeks compensation.  Plaintiff simply avers that in September 2015 she and her partners "sought to sell the property again."  *Id.*  Therefore, a real possibility exists that the loss in market value was caused by the partners' failure to sell the property in the years between her release and when it was sold in September 2015.  For these reasons, the undersigned finds that there is an insufficient factual basis to recommend an award of $508,597.48 for the lost opportunity to sell the property while Plaintiff was detained in Evin Prison.

### 4. Punitive Damages

Plaintiff additionally seeks the imposition of punitive damages in the amount of $46,713,224.  [Dkt. 12-1 at 52].  Plaintiff arrives at this number by doubling the total amount of compensatory damages sought.  *Id.*  Punitive damages are in fact authorized under § 1605A(c) of the FSIA.  They are appropriate in cases involving "outrageous conduct" and are intended to "punish and deter the actions for which they are awarded."  Restatement (Second) of Torts § 908(1); *Moradi*, 77 F. Supp. 3d at 72.  Here, Iranian authorities abducted and detained Plaintiff

---

[13] Mahmoud Habboush and Samuel Porter, *U.A.E. Says Dollar Peg Here to Stay as Devaluation Bets Climb*, BLOOMBERG (June 5, 2016, 6:36 AM) https://www.bloomberg.com/news/articles/2016-06-05/u-a-e-says-dollar-peg-here-to-stay-as-devaluation-bets-climb.

for 114 days, during which time they forced her to endure squalid living conditions, beatings, repeated threats of harm and death, and, most egregiously, two mock executions, all as part of a policy of intimidating and coercing confessions and information from dual Iranian-American citizens.  The undersigned recommends finding that this behavior is sufficiently outrageous to warrant the imposition of punitive damages against Defendants.

With respect to calculating an award for punitive damages, courts are expected to evaluate four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Braun*, 228 F. Supp. 3d at 86 (quoting *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 41 (D.D.C. 2012)).  In prior cases involving Iranian authorities as defendants, a few courts in this District have imposed punitive awards in the amount of $300,000,000, which was calculated as three times the amount of annual funding the Iranian Ministry of Information and Finance receives from the Iranian government.  *See Sutherland*, 151 F. Supp. 2d at 53; *see also Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 114 (D.D.C. 2000).  In other cases, punitive damages have been based on an evaluation of the annual amount Iran spends supporting terrorist activities, thereafter multiplied by a factor selected for deterrent effect.  *See Valore*, 700 F. Supp. 2d at 88.  However, in those cases, the court had the benefit of expert affidavits attesting to the funding amounts and appropriate multipliers, which are lacking in this case.

Courts that have rejected the multiplier formula illustrated by *Sutherland*, *Anderson*, and *Valore* have adopted the alternative approach of awarding punitive damages in an amount equal to the plaintiff's total compensatory damages.  *See e.g.*, *Hekmati*, 278 F. Supp. 3d at 167 (D.D.C. 2017); *Moradi*, 77 F. Supp. 3d at 73; *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 80–82 (D.D.C

2014). The undersigned recommends adopting that approach here. As Plaintiff's total compensatory damages in this case equals $13,028,889 for pain and suffering plus $5,176,733 in economic damages, the undersigned recommends an award of punitive damages in the amount of $18,205,622.

## V.     CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that Plaintiff's Motion for Default Judgment be **GRANTED** and that she be awarded damages in the amounts specified in the table below.

| Summary of Damages | |
|---|---:|
| Detention Pain and Suffering | $4,140,000 |
| Post-Detention Pain and Suffering | $8,888,889 |
| **Total Pain and Suffering** | **$13,028,889** |
| | |
| Lost Earnings | $4,894,934 |
| Medical and Legal Costs | $281,799 |
| **Total Economic Damages** | **$5,176,733** |
| | |
| **Total Compensatory Damages** | **$18,205,622** |
| | |
| **Punitive Damages** | **$18,205,622** |
| | |
| **Total Damage Award** | **$36,411,244** |

\*      \*      \*      \*      \*

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely objections to the

findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date: June 13, 2018

Digitally signed by G. Michael Harvey
Date: 2018.06.13 10:41:37 -04'00'

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE